[No. S121933. June 16, 2005.]

LIONEL SIMON, Plaintiff and Appellant, v.
SAN PAOLO U.S. HOLDING COMPANY, INC., Defendant and Appellant.

**1160**

## Counsel

Knapp Petersen & Clarke, André E. Jardini, Kevin J. Stack and Mitchell B. Ludwig for Plaintiff and Appellant.

Todd A. Smith; Jeffrey R. White; Smoger and Associates and Gerson H. Smoger for the Association of Trial Lawyers of America as Amicus Curiae on behalf of Plaintiff and Appellant.

Law Office of Daniel U. Smith, Daniel U. Smith and Ted Pelletier for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiff and Appellant.

Amy Bach; Pillsbury & Levinson, Arnold R. Levinson; Esner & Chang, Stuart B. Esner and Andrew N. Chang for United Policyholders as Amicus Curiae on behalf of Plaintiff and Appellant.

Epport & Richman, Epport, Richman & Robbins, Steven N. Richman and Lawrence A. Abelson for Defendant and Appellant.

Susan Liebeler; Daniel J. Popeo and David Price for Washington Legal Foundation as Amicus Curiae on behalf of Defendant and Appellant.

Horvitz & Levy, Lisa Perrochet and Curt Cutting for the California Chamber of Commerce, the American Chemistry Council, the National Association of Manufacturers, Unocal Corp. and American International Companies as Amici Curiae on behalf of Defendant and Appellant.

Mayer, Brown, Rowe & Maw, Andrew L. Frey, Evan M. Tager, Donald M. Falk; National Chamber Litigation Center and Robin S. Conrad for The Chamber of Commerce of the United States as Amicus Curiae on behalf of Defendant and Appellant.

Greines, Martin, Stein & Richland, Robert A. Olson and Feris M. Greenberger for Farmers Insurance Exchange, Truck Insurance Exchange, Fire Insurance Exchange and Mid-Century Insurance Company as Amici Curiae on behalf of Defendant and Appellant.

Hugh F. Young, Jr.; Martin, Bischoff, Templeton, Langlset & Hoffman, Jonathan M. Hoffman; Drinker Biddle & Reath and Alan Lazarus for The Product Liability Advisory Council, Inc., as Amicus Curiae on behalf of Defendant and Appellant.

Deborah J. La Fetra for Pacific Legal Foundation as Amicus Curiae.

## OPINION

**WERDEGAR, J.**—In an action arising from plaintiff's failed attempt to purchase an office building from defendant, the jury found that the parties had no binding and enforceable agreement but that defendant had committed promissory fraud. On his fraud cause of action, plaintiff was awarded $5,000 in economic compensatory damages and $1.7 million in punitive damages. Considering all the relevant circumstances, we conclude this award of punitive damages exceeds the federal due process limitations outlined in recent United States Supreme Court decisions. We further conclude the maximum award constitutionally permissible in the circumstances of this case is $50,000.

The central issue presented is whether, in addition to the $5,000 in compensatory damages awarded, the punitive damages award should be measured against the $400,000 in profit plaintiff claims he would have achieved had defendant sold the property to him at the agreed price. Plaintiff argues this amount represents either the uncompensated harm he suffered from defendant's conduct or the potential harm that conduct could have caused him. On this issue, we conclude that while uncompensated or potential harm may in some circumstances be properly considered in assessing the constitutionality of a punitive damages award, here defendant's fraud neither caused nor foreseeably threatened to cause $400,000 in harm to plaintiff. Under these circumstances, the $1.7 million punitive damages award must be measured against the $5,000 compensatory award, and so measured it is grossly excessive.

Our decision here addresses only the federal constitutional question, not any issue of excessiveness under California law.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Lionel Simon owns and operates a paper supply company, Liberty Paper Company, located in Los Angeles. In 1996, when the events that gave rise to this lawsuit occurred, Simon was leasing premises for his business; he had never before purchased a commercial building.

Defendant San Paolo U.S. Holding Company, Inc. (San Paolo Holding), is a wholly owned subsidiary of an Italian bank, Instituto Bancario San Paolo, S.p.A. (San Paolo Bank). In the mid-1990's, San Paolo Holding acquired and disposed of the nonperforming loans and real property of First Los Angeles Bank, a bank San Paolo Bank sold in 1995. At the end of 1996, San Paolo Holding had net assets worth around $46 million. Pursuant to a plan of liquidation, however, most of this wealth was transferred in cash to the parent corporation, and by 1998, when punitive damages were tried in this case, San Paolo Holding held only about $4.8 million in net assets.

Duane King, who represented San Paolo Holding in the failed negotiations with Simon, was a vice-president in charge of disposing of the properties acquired from First Los Angeles Bank. William Schack, a first vice-president of San Paolo Holding, supervised King.

In 1994, Simon noticed that a small downtown office building at 816 South Figueroa Street was for sale. He considered it perfect for his business needs and remained interested in buying it after San Paolo Holding acquired it

through foreclosure in late 1995. In March 1996, Simon learned that an arrangement to sell the building to an investment group headed by Robert DeVogelaere for $1.5 million had fallen through; Simon then asked William Atha, the real estate broker handling the property for San Paolo Holding, to present Simon's offer to buy the building for $1.2 million. In ensuing negotiations, King twice raised the asking price after obtaining Simon's oral agreement to buy, and no written agreement was reached. Additional negotiations in April and May collapsed in disputes over price (King wanted $1.35 million) and closing date (King wanted to close by the end of June for internal bookkeeping reasons, while Simon wanted a long escrow in case the foreclosed prior owner exercised its right of redemption).

The parties finally reached a tentative written agreement in June 1996. On June 12, King and Simon executed a letter of intent drafted by Atha, the broker. In exchange for San Paolo Holding's acceptance of a $1.1 million sale price, Simon promised his cooperation in closing the transaction by June 27. Escrow was to open by 5:00 p.m. the next day, June 13, upon the approval of San Paolo Bank's Los Angeles and New York offices. Simon was to deposit $50,000 to open escrow and was to complete all inspections and due diligence and secure financing by June 26, at which time his deposit would be released to the seller. The parties agreed "to exclusively negotiate upon execution of this letter" and "to proceed to escrow and attempt to complete a transaction based upon the above conditions," which were said to constitute the "essential elements" of the transaction. Simon added a hand-written addendum stating, "This letter is intended as a letter of intent only and this transaction is subject to approval by legal counsel of the deposit receipt and escrow instructions." (Simon retained counsel on June 12, paying a nonrefundable $5,000 retainer.) On the facsimile cover sheet transmitting the executed letter to Simon, Atha described it as a "signed letter of intent (nonbinding)."

On the morning of June 13, Atha asked Simon if he could have his inspections done by June 21, instead of June 26 as agreed. Simon replied that he also was anxious to complete the purchase and would try to have the inspections done by June 21. Later, Atha called to tell him that San Paolo Holding was now insisting on completion by June 21. Simon said he would agree to finish by June 24, a Monday, and to use his best efforts to do so by June 21, the previous Friday. Atha drafted a deposit receipt reflecting that schedule, but King did not sign it. Despite Atha's pointing out to both sides that they were only one business day apart in their positions, no further agreement was reached and escrow did not open as planned on June 13. Around 5:00 p.m. on June 13, King faxed a letter to Simon, giving notice that San Paolo Holding "has failed to come to terms with you" and "[a]ccordingly, we are terminating negotiations with you and plan to move on in our efforts to market the building."

Schack, King's supervisor in Los Angeles, testified that he and King wanted to sell the building at 816 South Figueroa Street in the quarter ending June 30, 1996, in order to maximize the department's bonus and show bank headquarters that the Los Angeles office was selling assets. According to Schack, after King signed the letter of intent specifying June 26 as the buyer's date to complete inspections and release his deposit, King and Schack instead decided that "the 21st was what would work for us." Although King told Schack that Simon had agreed to complete by June 24, King and Schack did not seek approval from the New York office for any date other than June 21. Because Simon would not agree to June 21, "the transaction was cancelled."

King agreed with Schack that the "big issue" causing failure of the sale to Simon was the date for completion of inspections and release of Simon's deposit. King also suggested that escrow could not be opened on June 13 because Simon did not submit the financial statements necessary for him to obtain financing from San Paolo Bank. Atha, however, testified that King told him San Paolo Holding would not accept Simon's deposit or financials because of the disagreement over the release date; Atha in turn told Simon not to bother tendering the deposit and submitting the financials.

On June 14, 1996, San Paolo Holding reached a written agreement to sell the building for $1 million to a group that included DeVogelaere, the investor with whom King had negotiated earlier in the year. At trial, the parties vigorously disputed whether King began the negotiations that led to this agreement during the period between executing the letter of intent with Simon on June 12 and terminating negotiations with him at 5:00 p.m. on June 13.

While King and DeVogelaere, in declarations submitted for the purpose of expunging a lis pendens Simon had filed in connection with this lawsuit, stated they had conducted no negotiations until after the negotiations with Simon were terminated, there was considerable evidence to the contrary: phone records showed numerous calls between King and DeVogelaere during the day on June 13, in which, DeVogelaere testified, they discussed his group's offer to buy the building; according to notes that Atha took before a call to Simon at 3:30 p.m. on June 13, and according as well to King's own testimony, King told Atha that afternoon not to tell Simon that King was talking to another possible buyer; the sale contract originally bore dates of June 12 and June 13, later overwritten to read June 14; the offer sheet was also dated June 13; and Schack faxed the offer sheet and a credit memorandum to the New York office at 9:15 a.m. on June 14, casting doubt on King's

testimony that starting around 8:00 a.m. on the morning of June 14 he signed the contract at his Malibu home, took the executed contract to DeVogelaere's home in Pacific Palisades, drove to his downtown Los Angeles office (a trip DeVogelaere testified ordinarily took at least 45 minutes), and prepared the offer sheet and detailed credit memorandum.

Even after opening escrow with the DeVogelaere group, King had Atha, as yet unaware of the DeVogelaere contract, engage in renewed negotiations with Simon, orally offering on June 17 to accept a June 26 deposit release date and to pay $5,000 to help with Simon's due diligence. Simon instead filed this lawsuit on June 21, 1996. His lis pendens was later expunged, and the DeVogelaere sale closed in August 1996.

Simon's real estate valuation expert testified the building was worth $1.5 million as of June 1996, $400,000 more than Simon was to pay under the letter of intent. San Paolo Holding's expert, who had also previously appraised the building at $1.5 million, nevertheless testified to a value of only $1 million, based in large part on the sale for that amount to the DeVogelaere group.

Simon sued San Paolo Holding for breach of contract and promissory fraud. As to breach of contract, the jury by special verdict found the parties had no "binding and enforceable agreement." As to fraud, the jury found San Paolo Holding had made "a false promise about a material matter" to Simon without the intent to perform and with the intent to defraud Simon, and that Simon had justifiably relied on the promise and was damaged in the amount of $5,000. The jury also found by clear and convincing evidence that San Paolo Holding acted with fraud, malice or oppression and awarded Simon $2.5 million in punitive damages. On San Paolo Holding's motion for a new trial, the trial court ordered a new trial on punitive damages unless Simon agreed to their reduction to $250,000. Simon declined the remittitur. On retrial of punitive damages, a new jury awarded him $1.7 million, and the trial court rendered judgment upon that award together with the $5,000 in compensatory damages.

The Court of Appeal affirmed. The United States Supreme Court granted certiorari, vacated the decision and remanded the case to the Court of Appeal for further consideration in light of *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.* (2001) 532 U.S. 424 [149 L.Ed.2d 674, 121 S.Ct. 1678] (*Cooper Industries*). Upon reconsideration, the Court of Appeal again affirmed, but the high court again granted certiorari, vacated and remanded, this time for further consideration in light of *State Farm Mut. Auto Ins. Co. v.*

*Campbell* (2003) 538 U.S. 408 [155 L.Ed.2d 585, 123 S.Ct. 1513] *(State Farm)*. In its third decision in this matter, the Court of Appeal again affirmed the punitive damages award, holding it was not unconstitutionally excessive under guidelines established in *State Farm* and *BMW of North America v. Gore* (1996) 517 U.S. 559 [134 L.Ed.2d 809, 116 S.Ct. 1589] *(BMW)*. The appellate court concluded that the "continuous and intricate" deceit by San Paolo Holding's officer, King, was sufficiently reprehensible to support a substantial award and that the $1.7 million punitive damages award was only just over four times Simon's actual loss, the $400,000 difference between what his expert testified the building was worth and what Simon had agreed to pay for it.

We granted San Paolo Holding's petition for review, which presented the question whether the punitive damages award is unconstitutionally excessive under *State Farm* and its predecessors.[1]

DISCUSSION

█ In a series of decisions culminating in *State Farm, supra,* 538 U.S. 408, the United States Supreme Court has determined that the due process clause of the Fourteenth Amendment to the United States Constitution places limits on state courts' awards of punitive damages, limits appellate courts are required to enforce in their review of jury awards. (See *Pacific Mut. Life Ins. Co. v. Haslip* (1991) 499 U.S. 1, 18–24 [113 L.Ed.2d 1, 111 S.Ct. 1032]; *TXO Production Corp. v. Alliance Resources Corp.* (1993) 509 U.S. 443, 453–458 [125 L.Ed.2d 366, 113 S.Ct. 2711] (plur. opn. of Stevens, J.); *BMW, supra,* 517 U.S. at p. 568; *Cooper Industries, supra,* 532 U.S. at pp. 433–436; *State Farm, supra,* at pp. 416–418.) The imposition of "grossly excessive or arbitrary" awards is constitutionally prohibited, for due process entitles a tortfeasor to " 'fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose.' " *(State Farm, supra,* at pp. 416–417, quoting *BMW, supra,* at p. 574.)

Eschewing both rigid numerical limits and a subjective inquiry into the jury's motives, the high court eventually expounded in *BMW* and *State Farm* a three-factor weighing analysis looking to the nature and effects of the

---

[1] Because the present petition goes only to federal issues, we do not address whether the award is excessive under state law standards. (See *Adams v. Murakami* (1991) 54 Cal.3d 105, 109–110 [284 Cal.Rptr. 318, 813 P.2d 1348]; *Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 927–928 [148 Cal.Rptr. 389, 582 P.2d 980].) And because San Paolo Holding's challenge at this stage of the litigation is to the Court of Appeal's failure to reduce the award on remand from the United States Supreme Court, not to the jury instructions employed at trial, we address neither the correctness of those instructions nor the question whether, as plaintiff contends, San Paolo Holding invited any error by submitting standard instructions on punitive damages.

defendant's tortious conduct and the state's treatment of comparable conduct in other contexts. As articulated in *State Farm*, the constitutional "guideposts" for reviewing courts are: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." (*State Farm*, *supra*, 538 U.S. at p. 418; see *BMW*, *supra*, 517 U.S. at p. 575.)

██ In deciding whether an award of punitive damages is constitutionally excessive under *State Farm* and its predecessors, we are to review the award de novo, making an independent assessment of the reprehensibility of the defendant's conduct, the relationship between the award and the harm done to the plaintiff, and the relationship between the award and civil penalties authorized for comparable conduct. (*State Farm*, *supra*, 538 U.S. at p. 418; *Cooper Industries*, *supra*, 532 U.S. at pp. 436–443.) This "[e]xacting appellate review" is intended to ensure punitive damages are the product of the " ' "application of law, rather than a decisionmaker's caprice." ' " (*State Farm*, *supra*, at p. 418.)[2]

On the other hand, findings of historical fact made in the trial court are still entitled to the ordinary measure of appellate deference. (*Cooper Industries*, *supra*, 532 U.S. at p. 440, fn. 14; see also *Leatherman Tool Group, Inc. v. Cooper Industries, Inc.* (9th Cir. 2002) 285 F.3d 1146, 1150 (decision on remand) ["Although determining the 'degree of reprehensibility' ultimately involves a legal conclusion, we must accept the underlying facts as found by the jury and the district court"].) Here, for example, the jury expressly found that the parties had no binding and enforceable agreement, but that San Paolo Holding made a fraudulent promise upon which Simon justifiably relied to his detriment in the amount of $5,000. As neither party contends these findings lack substantial evidentiary support in the record, we accept them as the factual basis for our constitutional analysis of the punitive damages award.

---

[2] The requirement of independent review applies to state as well as federal appellate courts when assessing excessiveness under the federal due process clause. (See *State Farm*, *supra*, 538 U.S. at p. 418 ["courts reviewing punitive damages" must independently review *BMW* factors]; *id.* at p. 429 [remanding case to Utah Supreme Court for state courts to make a "proper calculation of punitive damages under the principles we have discussed"]; *Time Warner Entertainment Company v. Six Flags Over Georgia, LLC* (2002) 254 Ga.App. 598, 599 [563 S.E.2d 178, 180–181]; *O'Neill v. Gallant Insurance Company* (2002) 329 Ill.App.3d 1166, 1181 [263 Ill.Dec. 898, 769 N.E.2d 100, 113].) But when no federal due process issue is involved, as when awards are reviewed for excessiveness under *state* law, the high court's decisions do not forbid greater deference to jury verdicts or trial court judgments. (*Cooper Industries*, *supra*, 532 U.S. at p. 433; *Time Warner Entertainment Company v. Six Flags Over Georgia, LLC*, *supra*, at pp. 181–182.)

The Court of Appeal, however, erred in "presum[ing]," simply from the size of the punitive damages award, that the jury found Simon had suffered "an actual loss of at least . . . $400,000." The jury made no such express finding, and to infer one from the size of the award would be inconsistent with de novo review, for the award's size would thereby indirectly justify itself. (See *Cooper Industries, supra,* 532 U.S. at pp. 441–442 [determining independently that the potential harm from the defendant's unfair competition (passing off the plaintiff's product as its own) did not extend to all of the defendant's profits from the product for five years].)

I. *Uncompensated Harm/Potential Harm*

Before undertaking the multifactor evaluation mandated by *BMW, supra,* 517 U.S. 559, and *State Farm, supra,* 538 U.S. 408, we address Simon's principal arguments for upholding the award: that the $400,000 gain he assertedly would have made by purchasing the subject building for $1.1 million may be deemed a measure of either the harm San Paolo Holding's fraud actually caused him or the harm it potentially could have caused him, and that such uncompensated or potential harm may properly be considered in the comparison of punitive damages to harm required by the high court. San Paolo Holding, in contrast, contends the actual compensatory damages award, here $5,000, provides the appropriate basis for comparison under the high court's rulings.

■ United States Supreme Court precedents appear to contemplate, in some circumstances, the use of measures of harm beyond the compensatory damages. Thus in *State Farm,* discussing the second *BMW* "guidepost," the high court spoke repeatedly of a proportionality between punitive damages and the harm or "potential harm" suffered by the plaintiff. (*State Farm, supra,* 538 U.S. at pp. 418, 424.) At another point (*id.* at p. 426), the court referred to the relationship between punitive damages and both "the amount of harm" and "the general damages recovered," impliedly recognizing that these two are not always identical. More explicitly, in *State Farm* the high court reiterated its recognition in *BMW* that in some cases compensatory damages are not the definitive quantification of harm because " 'the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.' " (*State Farm, supra,* at p. 425, quoting *BMW, supra,* 517 U.S. at p. 582.)

*State Farm*'s reference to potential harm echoed the high court's earlier decision in *TXO Production Corp. v. Alliance Resources Corp., supra,* 509 U.S. 443 (*TXO*), a business tort case in which the court approved a $10

million punitive damages award on compensatory damages of only $19,000. The plurality opinion relied heavily on the economic injuries the defendant's scheme to cheat the plaintiff of oil and gas royalties could have caused had it succeeded, injuries estimated in the millions of dollars. (*Id.* at pp. 459–462.) "It is appropriate to consider the magnitude of the *potential harm* that the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded . . . ." (*Id.* at p. 460; see also *id.* at p. 484 (dis. opn. of O'Connor, J.) ["I have no quarrel with the plurality that, in the abstract, punitive damages may be predicated on the potential but unrealized harm to the victim"].)

In the wake of *TXO*, *BMW* and *State Farm*, a large number of federal and state courts have, in a variety of factual contexts, considered uncompensated or potential harm as part of the predicate for a punitive damages award.[3] In the present case, however, we conclude that the $400,000 in profit that plaintiff might have gained by purchasing the building is not a proper consideration.

---

[3] See, e.g., *Romo v. Ford Motor Co.* (2003) 113 Cal.App.4th 738, 760–761 [6 Cal.Rptr.3d 793] (considering harm to decedents that cannot be compensated under California law); *Mathias v. Accor Economy Lodging, Inc.* (7th Cir. 2003) 347 F.3d 672, 677 (relatively large ratio between punitive and compensatory damages for rental of motel room infested with bedbugs justified in part because "the compensable harm done was . . . difficult to quantify because a large element of it was emotional"); *DiSorbo v. Hoy* (2d Cir. 2003) 343 F.3d 172, 187 (where jury awarded only nominal damages on abuse of process claim, ratio between punitive and compensatory damages was " 'not the best tool' " for analysis); *Continental Trend Resources, Inc. v. OXY USA* (10th Cir. 1996) 101 F.3d 634, 639–640 (potential harm from tortious interference with contract may be considered); *In re the Exxon Valdez* (D.Alaska 2004) 296 F.Supp.2d 1071, 1103 (had ship captain succeeded in backing oil tanker off reef, additional oil could have spilled, causing "immense and incalculable" additional harms); *Southern Union Company v. Southwest Gas Corporation* (D.Ariz. 2003) 281 F.Supp.2d 1090, 1099–1105 (unquantifiable harm from breach of public trust and potential harm from intentional interference with corporate merger may be considered to justify relatively large punitive damages award against state corporations commissioner); *Parrish v. Sollecito* (S.D.N.Y. 2003) 280 F.Supp.2d 145, 163 (potential emotional distress from illegal discrimination and retaliation increases reprehensibility); *Craig v. Holsey* (2003) 264 Ga.App. 344, 349 [590 S.E.2d 742, 744, 748] (while the plaintiff in automobile accident case actually suffered only about $8,800 in damages, she "could have died as a result of the [defendant's] driving under the influence"); *In re New Orleans Train Car Leakage Fire Litigation* (La.Ct.App. 2001) 795 So.2d 364, 386 (justifying size of punitive damages award in part by observing that if train car leaking flammable gas had exploded as well as burning "whole city blocks of a residential area could have been destroyed"); *Madeja v. MPB Corporation* (2003) 149 N.H. 371, 387–388 [821 A.2d 1034, 1050–1051] (relatively high ratio between punitive and compensatory damages permitted in sexual harassment case due to "the difficulty of measuring actual damages where the injury is primarily personal"); *Trinity Evangelical Lutheran Church v. Tower Ins. Co.* (2003) 261 Wis.2d 333, 362 [661 N.W.2d 789, 803] (considering potential injury had insurer's bad faith denial of coverage succeeded at summary judgment). By citing these cases, we do not necessarily indicate agreement with each particular result.

As explained above, we must determine independently the relationship between the harm done plaintiff and the amount awarded in punitive damages. (*Cooper Industries, supra*, 532 U.S. at pp. 436–440.) While we defer to express jury findings supported by the evidence (see *ante*, at p. 9), in the absence of an express finding on the question we must independently decide whether defendant's promissory fraud did, or foreseeably could have, hurt plaintiff in the amount of $400,000.

The first jury did not specify the "false promise about a material matter" it found San Paolo Holding had made. Based on the evidence and argument, the finding could refer to San Paolo Holding's express promise, in the letter of intent, to "proceed to escrow and attempt to complete a transaction" on the agreed terms, to its express promise to "exclusively negotiate," to its implied promise to seek approval from the New York office for a sale on the agreed terms, or to any combination of these. None of these possible false promises, however, was the factual cause of a $400,000 loss to Simon. Had San Paolo Holding never promised to proceed to escrow, never promised to negotiate exclusively with Simon, and never promised to seek the New York office's approval, Simon would still not have obtained the property. Simon, the first jury found, had no contractual right to buy the property. Consequently, San Paolo Holding's promissory fraud did not deprive him of property he would otherwise have obtained; it merely led him, as the jury indeed found, to spend $5,000 to retain an attorney in anticipation of opening escrow.

*Gray v. Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498 [198 Cal.Rptr. 551, 674 P.2d 253] is closely on point. The plaintiff made an offer to purchase real property for his business. The broker falsely told him the sellers had accepted his offer, leading him to expend various sums in anticipation of closing the purchase and moving to the new site. In the plaintiff's action against the broker for fraud, we held he was entitled to the amounts he had spent in reliance on the misrepresentation, but not to claimed "delay damages" for increases in the cost of construction during the six-month period he believed the purchase would proceed. (*Id.* at p. 504.) The plaintiff's inability to promptly begin renovating the property for his business, we explained, "was not caused by [the broker's] misrepresentation, but by the sellers' refusal to accept his offer of sale." (*Ibid.*; accord, *Kenly v. Ukegawa* (1993) 16 Cal.App.4th 49, 53–55 [19 Cal.Rptr.2d 771] [where the defendant falsely promised to sell the plaintiff farm property, the plaintiff may recover only costs incurred in reliance on the promise, not profits that would have been gained had he purchased and resold the property].)

 Simon contends, and the Court of Appeal agreed, that he was precluded from recovering the $400,000 in lost profits only by operation of Civil Code section 3343, subdivision (a)(1), which in effect sets damages for

a defrauded *attempted* purchaser of property at the "[a]mounts actually and reasonably expended in reliance upon the fraud." We disagree. Regardless of the effect of Civil Code section 3343, Simon could not recover those lost profits on his promissory fraud cause of action because *the fraud did not cause them.* Fraudulent promises to sell (as in *Kenly v. Ukegawa, supra,* 16 Cal.App.4th at p. 55), fraudulent representations that an offer to purchase has been accepted (as in *Gray v. Don Miller & Associates, Inc., supra,* 35 Cal.3d at p. 504) or, as here, fraudulent promises to negotiate exclusively and proceed to escrow may cause the attempted buyer to expend money in reliance, but they do not themselves cause the losses occasioned by the attempted buyer's failure to actually obtain the property. That injury is instead caused by the seller's breach of an enforceable contractual obligation to sell the property—where one exists. If Simon had prevailed on his breach of contract cause of action, he would have been entitled to recover on that cause of action the benefit of his bargain, here assertedly $400,000, because San Paolo Holding's refusal to sell to him caused that injury. (See Civ. Code, § 3306.) But San Paolo Holding in fact had no contractual obligation to sell Simon the property. It had an obligation—imposed by law—not to fraudulently promise to sell Simon the property, but had San Paolo Holding complied with its legal obligation by refraining from making false promises, Simon still would not have obtained the property.[4]

This is not a case like *Neal v. Farmers Ins. Exchange, supra,* 21 Cal.3d 910, in which a statute barred recovery of damages actually caused by the defendant's tortious acts. In that insurance bad faith case, the plaintiff died before judgment, precluding her estate's recovery of damages for emotional distress. (*Id.* at p. 920, fn. 3; see Code Civ. Proc., § 377.34 (formerly Prob. Code, § 573).) Considering it "likely that absent this limitation plaintiff would have recovered a substantial additional amount in compensation for emotional distress," this court held the disparity between the relatively small compensatory damages award and the significant award of punitive damages did not require nullification of the latter under state law. (*Neal v. Farmers Ins. Exchange, supra,* at p. 929; see also *Romo v. Ford Motor Co., supra,* 113 Cal.App.4th at pp. 760–761 [reaching similar conclusion under *State Farm*].) Farmers' bad faith conduct had actually caused Mrs. Neal substantial emotional

---

[4] Simon cites our decision in *Lazar v. Superior Court* (1996) 12 Cal.4th 631, 646 [49 Cal.Rptr.2d 377, 909 P.2d 981], for the proposition that fraud plaintiffs generally may recover benefit-of-bargain as well as out-of-pocket damages. The reliance is misplaced: our reference in that decision to benefit-of-bargain damages was to their recovery under a *contract* cause of action. (See *Tavaglione v. Billings* (1993) 4 Cal.4th 1150, 1159 [17 Cal.Rptr.2d 608, 847 P.2d 574].) On a different point, nothing we say in this case affects the scope of damages recoverable for fraud committed by a fiduciary. (See *Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1240–1241 [44 Cal.Rptr.2d 352, 900 P.2d 601].)

distress; her estate was barred from recovering such damages only by Probate Code former section 573. In contrast, San Paolo Holding's false promise or promises, as we have seen, did not cause Simon's failure to obtain the property; even in the absence of Civil Code section 3343, subdivision (a)(1), he would not be entitled to recover benefit-of-the-bargain damages for San Paolo Holding's promissory fraud.

Simon also contends San Paolo Holding's fraud was intended to cause him, or risked causing him, "potential losses . . . well in excess of $455,000." In addition to the $400,000 anticipated profit from acquiring the building and his $5,000 out-of-pocket loss, Simon includes in this sum the $50,000 deposit that was, under the letter of intent, to become nonrefundable upon completion of inspections and due diligence on June 26, 1996. Simon argues that had he agreed to King's demand to move the completion date up to June 21, King "would likely have strung [him] along until the 22nd, and then manufactured some other reason to back out of the sale," resulting in the loss of his deposit. Simon further contends his potential losses include an unquantified financial impact: had he given up his leased business premises after signing the letter of intent, he would then have "found himself on the street" when San Paolo Holding pulled out of the sale. We conclude, however, that these asserted potential injuries, like the uncompensated harm Simon claims, may not be considered in assessing the ratio of punitive damages to harm.

■ The potential harm that is properly included in the due process analysis is " 'harm *that is likely to occur from the defendant's conduct.*' " (*TXO, supra*, 509 U.S. at p. 460.) In *TXO*, the high court, quoting from the state court decision, gave a hypothetical illustration: " 'For instance, a man wildly fires a gun into a crowd. By sheer chance, no one is injured and the only damage is to a $10 pair of glasses. A jury reasonably could find only $10 in compensatory damages, but thousands of dollars in punitive damages to teach a duty of care.' " (*Id.* at p. 459.) A potential injury that was foreseeable from the defendant's conduct—whether because it constituted an unintended but reasonably likely risk or because it was a goal of the tortfeasor's conduct—is properly considered because the tortfeasor had notice of the likelihood of such an injury. Considering such injuries in assessing punitive damages therefore comports with the due process mandate that "a person receive fair notice . . . of the severity of the penalty that a State may impose." (*BMW, supra*, 517 U.S. at p. 574.)

In *TXO* itself, the defendant, hoping to renegotiate downward the royalties it had agreed to pay for development of the plaintiff's oil and gas rights, had solicited a false affidavit impairing the plaintiff's title, then brought an

unsuccessful declaratory relief action in state court. (*TXO, supra,* 509 U.S. at pp. 448–449.) The high court plurality held it appropriate to consider the harm "the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded." (*Id.* at p. 460.) Other cases have also considered foreseeable potential injuries in the punitive damages-to-harm ratio.[5]

By contrast, in *Pulla v. Amoco Oil Co.* (8th Cir. 1995) 72 F.3d 648, where the employer defendant had invaded the employee plaintiff's private credit card records to determine whether he had been abusing sick leave, the potential injury to other employees from similar conduct could not properly be considered because such injury was not "*likely* to occur" from the defendant's tortious conduct—the plaintiff "failed to present any evidence that Amoco put any other individual's privacy at risk." (*Id.* at p. 660.) And in *Leatherman Tool Group, Inc. v. Cooper Industries, Inc., supra,* 285 F.3d at page 1149, the appellate court declined to consider as a measure of potential harm all of the gross profits the defendant might have made on its copycat product had the plaintiff not obtained a preliminary injunction against the product's sale, as the sale of the copied product was not itself illegal, though passing it off as the plaintiff's was.

The present case more closely resembles the last cited decisions, in which the asserted potential injuries were not foreseeable results of the defendant's tortious conduct, than it does the decisions approving consideration of potential losses. The $400,000 in profit Simon claims he would have earned by acquiring the property cannot be considered potential harm from San Paolo Holding's promissory fraud because, in the absence of any contractual obligation to sell Simon the property, San Paolo Holding's tortious conduct could not have had the foreseeable effect of depriving Simon of an entitlement to purchase it. As in *Leatherman Tool Group, Inc. v. Cooper Industries, Inc., supra,* 285 F.3d at page 1149, Simon erroneously characterizes damages he might have obtained on another cause of action, one on which he did not prevail, as potential damages for the cause of action on which he did prevail. And, as in *Pulla v. Amoco Oil Co., supra,* 72 F.3d at pages 659–660, Simon's

---

[5] See *Southern Union Company v. Southwest Gas Corporation, supra,* 281 F.Supp.2d at page 1104, footnote 5 (where the defendant corporations commissioner's "undisputed experience and knowledge made him aware of the potential enormous risks . . . his conduct would have in disrupting a multi-million dollar transaction"); *In re New Orleans Train Car Leakage Fire Litigation, supra,* 795 So.2d at page 386 (where the defendant railroad's reckless conduct "could have" resulted in a "monumental catastrophe"); *Trinity Evangelical Lutheran Church v. Tower Ins. Co., supra,* 661 N.W.2d at pages 793–794, 803 (where the defendant insurer had unsuccessfully sought, by summary judgment, to avoid coverage that the parties had intended to include in the policy, making it proper to consider the further injury to the insured that would have resulted had the insurer's attempt to avoid coverage succeeded).

potential loss of his $50,000 deposit was simply not shown to be a likely result of defendant's fraud: to obtain the $50,000, San Paolo Holding would first have had to open escrow, which required entering into a binding contract of sale, giving Simon an enforceable right to purchase. The same may be said of Simon's possible cancellation of his then current leasing arrangement: that he might do so without first entering into a binding purchase contract was not foreseeable, and had he done so after executing such a contract he would not have been "out on the street" because he could have enforced the contract. As observed by an amicus curiae, "there is no basis for believing that San Paolo [Holding] knew that Simon was at risk of having no place to operate his business, much less intended him to suffer that consequence."

As the record does not reveal the goals of San Paolo Holding's fraud, it is difficult to say what injuries beyond his $5,000 out-of-pocket loss, if any, Simon would have suffered had those goals been achieved. To the extent King, for reasons that are not apparent,[6] simply wanted to keep Simon on the hook as long as possible, he succeeded, but Simon's only resulting loss, as far as the record shows, was the $5,000 retainer. (See *Bains LLC v. Arco Products Company* (9th Cir. 2005) 405 F.3d 764 [no potential harm to be added to compensatory damages where the defendant's wrongful conduct succeeded].) King's scheme, whatever it was, evidently did not extend to executing and then breaching a binding contract of sale, for he had the opportunity to execute such a contract on June 13, 1996, and instead broke off dealings with Simon. We are thus unable to conclude Simon demonstrated the existence of substantial potential damages representing harm "the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded." (*TXO, supra,* 509 U.S. at p. 460.)

The $5,000 award of compensatory damages, therefore, must be considered the true measure of the harm (or potential harm) San Paolo Holding's tortious act caused to Simon.

## II. *Evaluation of the Award Under State Farm and BMW*

We now consider in sequence the three guideposts prescribed by the high court: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in

---

[6] Simon has suggested that King had a personal financial motive for ultimately selling to the DeVogelaere group rather than to Simon. Even if true, this would not explain why King first executed a letter of intent with Simon.

comparable cases." (*State Farm, supra,* 538 U.S. at p. 418; see *BMW, supra,* 517 U.S. at p. 575.)

### A. Degree of Reprehensibility

 The high court in both *BMW* and *State Farm* recognized that "the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." (*State Farm, supra,* 538 U.S. at p. 419; *BMW, supra,* 517 U.S. at p. 575.) In *State Farm,* the court summarized the subsidiary factual circumstances it believed particularly relevant to assessing reprehensibility: "We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." (*State Farm, supra,* at p. 419.)

Here, defendant's tortious acts caused only economic harm and did not show disregard of others' health or safety. The first two subfactors are clearly inapplicable.

The parties dispute whether Simon was financially vulnerable, but we assess this factor as essentially neutral. While San Paolo Holding had financial resources vastly superior to Simon's, the transaction was an arm's-length one upon which neither party depended for economic survival or security; Simon wanted to buy the office building and San Paolo Holding wanted to sell it (albeit seemingly not to Simon), but neither *needed* for the transaction to go through. This limited the leverage San Paolo Holding's superior financial position might otherwise have given it over Simon.

Similarly, although San Paolo Holding's conduct could be characterized as more than a single isolated incident, as the evidence showed deceptive conduct by King spanning several weeks, the tortious act on which liability was based was a single false promise (or set of promises) made in the letter of intent, and no evidence indicated King had acted similarly toward other potential buyers. Unlike, for example, the defendant in our companion case of *Johnson v. Ford Motor Co.* (2005) 35 Cal.4th 1191, San Paolo Holding cannot be characterized as a repeat offender. This subfactor, too, fails to support a high assessment of reprehensibility.

■ Finally, San Paolo Holding concedes King's making of one or more intentionally false promises, as the jury found he did, constitutes "intentional . . . deceit" (*State Farm, supra,* 538 U.S. at p. 419) rather than a "mere accident" (*ibid.*). We agree this subfactor applies. True, a comparison to accidentally caused harm is of little value in assessing a California punitive damages award, as accidentally harmful conduct cannot provide the basis for punitive damages under our law. At a minimum, California law requires conduct done with "willful and conscious disregard of the rights or safety of others" or despicable conduct done "in conscious disregard" of a person's rights. (Civ. Code, § 3294, subd. (c)(1), (2); see *Taylor v. Superior Court* (1979) 24 Cal.3d 890, 895–896 [157 Cal.Rptr. 693, 598 P.2d 854] [conscious disregard means "that the defendant was aware of the probable dangerous consequences of his conduct, and that he wilfully and deliberately failed to avoid those consequences"].) The jury's finding that King made false promises with the *intent to defraud* Simon shows he was not merely indifferent to, but actively sought an injury to, Simon's rights. He did so, moreover, through affirmative misrepresentation, not merely nondisclosure. (See *BMW, supra,* 517 U.S. at p. 580 ["[T]he omission of a material fact may be less reprehensible than a deliberate false statement"].) The final reprehensibility subfactor, then, does weigh on the plus side of the scale.

In sum, of the five subfactors relevant to reprehensibility, only one applies. In the universe of cases warranting punitive damages under California law, the fraudulent promise or promises that led to San Paolo Holding's liability have to be regarded as of relatively low culpability.

### B. *Ratio of Punitive Damages to Actual or Potential Harm*

While the high court had in *BMW* and earlier decisions already demanded that punitive damages bear a " 'reasonable relationship' " to compensatory damages (*BMW, supra,* 517 U.S. at p. 580) and had in *BMW* made that relationship one of the three "guideposts" for due process evaluation (*id.* at pp. 574–575, 580–581), the decision in *State Farm* addressed this guidepost with markedly greater emphasis and more constraining language. "If, in [*BMW*], the high court threw a lasso around the problem of what it had previously identified as 'punitive damages awards " 'run wild' " ' [citation], in [*State Farm*] it tightened the noose considerably." (*Bardis v. Oates* (2004) 119 Cal.App.4th 1, 19 [14 Cal.Rptr.3d 89].)

■ In *BMW*, the court not only abjured drawing " 'a mathematical bright line,' " but also observed that "[i]n most cases, the ratio will be within a constitutionally acceptable range," disapproving only the "breathtaking 500 to

1" ratio in the case before it. (*BMW, supra*, 517 U.S. at p. 583.) In *State Farm*, while still "declin[ing] . . . to impose a bright-line ratio which a punitive damages award cannot exceed," the court went on to hold that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." (*State Farm, supra*, 538 U.S. at p. 425.) The court also explained that past decisions and statutory penalties approving ratios of 3 or 4 to 1 were "instructive" as to the due process norm, and that while relatively high ratios could be justified when " 'a particularly egregious act has resulted in only a small amount of economic damages' [citation] . . . [t]he converse is also true . . . . When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." (*Ibid.*)

■ We understand the court's statement in *State Farm* that "few awards" significantly exceeding a single-digit ratio will satisfy due process to establish a type of presumption: ratios between the punitive damages award and the plaintiff's actual or potential compensatory damages significantly greater than 9 or 10 to 1 are suspect and, absent special justification (by, for example, extreme reprehensibility or unusually small, hard-to-detect or hard-to-measure compensatory damages), cannot survive appellate scrutiny under the due process clause.[7] As stated in *Williams v. ConAgra Poultry Company* (8th Cir. 2004) 378 F.3d 790, 799, a ratio significantly greater than single digits "alerts the court[] to the need for special justification." (See also *Bardis v. Oates, supra*, 119 Cal.App.4th at p. 22 [42-to-1 ratio "cannot stand unless extraordinary factors are present"]; *McClain v. Metabolife International, Inc., supra*, 259 F.Supp.2d at p. 1231 ["red flag goes up" when ratio exceeds single digit].)

Multipliers *less* than nine or 10 are not, however, presumptively *valid* under *State Farm*. Especially when the compensatory damages are substantial or already contain a punitive element, lesser ratios "can reach the outermost limit of the due process guarantee." (*State Farm, supra*, 538 U.S. at p. 425.) But we do not agree with the court in *Diamond Woodworks, Inc. v. Argonaut Insurance Company* (2003) 109 Cal.App.4th 1020, 1057 [135 Cal.Rptr.2d 736], that "in the usual case" the high court's decisions establish an "outer

---

[7] Though one court has referred to a 9-to-1 ratio as the constitutional trigger point (*McClain v. Metabolife International, Inc.* (N.D.Ala. 2003) 259 F.Supp.2d 1225, 1231), one could also argue a "single-digit" ratio includes anything less than 10 to 1. (See *Hollock v. Erie Insurance Exchange* (2004) 2004 PASuper. 13, 40 [842 A.2d 409, 422] [10-to-1 ratio "just barely exceeds" single-digit level].) The question is of little or no importance, however, as the presumption of unconstitutionality applies only to awards exceeding the single-digit level "to a significant degree." (*State Farm, supra*, 538 U.S. at p. 425.)

constitutional limit" of approximately *four* times the compensatory damages. Reviewing the history of double, triple and quadruple damages, the court in *State Farm* warned that "these ratios are *not binding*," but only "instructive." (*State Farm, supra,* at p. 425, italics added.) Moreover, their instruction, what "[t]hey demonstrate," is simply that "[*s*]*ingle digit* multipliers are more likely to comport with due process" than ratios of 500 to 1, as in *BMW,* or 145 to 1, as in *State Farm. (Ibid.,* italics added.)

■ Measurement of damages is, of course, far from exact, a fact reflected in the high court's qualification of its single-digit presumption: only awards exceeding that level "to a significant degree" are constitutionally suspect. (*State Farm, supra,* 538 U.S. at p. 425.) As due process does not entitle a tortfeasor to notice of the *precise* amount the state may penalize him or her, "[t]he judicial function is to police a range, not a point" (*Mathias v. Accor Economy Lodging, Inc., supra,* 347 F.3d at p. 678).

The disputed $1.7 million punitive damages award to Simon was 340 times his $5,000 award of compensatory damages. This qualifies as a "breathtaking" multiplier (*BMW, supra,* 517 U.S. at p. 583), far outside the "single-digit neighborhood" (*Bocci v. Key Pharmaceuticals, Inc.* (2003) 189 Ore.App. 349, 359 [76 P.3d 669, 675], mod. on other grounds and adhered to as mod., 190 Ore.App. 407 [79 P.3d 908]) suggested by the high court in *State Farm.* As we have already determined, moreover, the $5,000 compensatory award accurately measures the actual harm done to Simon, and Simon failed to demonstrate that San Paolo Holding's fraud threatened to cause him substantial additional harm. (See pt. I., *ante.*) Nor can the 340-to-1 ratio here be justified on the ground that " 'a *particularly* egregious act has resulted in only a small amount of economic damages' " (*State Farm, supra,* 538 U.S. at p. 425, italics added), for while San Paolo Holding's fraud qualified for punitive damages under California law, compared to conduct in other punitive damages cases it was not highly reprehensible. (See pt. II.A., *ante*; accord, *Atkinson v. Orkin Exterminating Co., Inc.* (2004) 361 S.C. 156, 171 [604 S.E.2d 385, 393] [despite "particlarly low" compensatory damages of $6,191, ratio of 127 to 1 not justified because conduct not sufficiently egregious].)

Measured against the second *BMW/State Farm* guidepost, therefore, the punitive damages award is grossly excessive.

## C. *Comparable Civil Penalties*

The third guidepost is less useful in a case like this one, where plaintiff prevailed only on a cause of action involving "common law tort duties that

do not lend themselves to a comparison with statutory penalties" (*Continental Trend Resources v. OXY USA, Inc., supra,* 101 F.3d at p. 641), than in a case where the tort duty closely parallels a statutory duty for breach of which a penalty is provided. The parties have not drawn our attention to any specific statutory civil penalties for promissory fraud in a business transaction, though defendant cites Business and Professions Code section 17206, allowing a $2,500 penalty for unfair competition (which, as the lower court noted, does not necessarily involve fraudulent acts). The Court of Appeal, in turn, cited provisions providing for treble fines or damages for fraudulent or deceptive acts in other contexts (e.g., Civ. Code, §§ 3345 [deceptive practices causing economic injury to disabled or senior persons], 1947.10 [fraudulent eviction in municipality with rent controls]), as well as statutes criminalizing theft by fraud (Pen. Code, §§ 182, subd. (a)(4), 484, subd. (a); see also *id.,* § 672 [fine of $1,000 for misdemeanor and $10,000 for felony]).[8]

While comparison to these statutory penalties cannot tell us precisely how large an award would be constitutional, it clearly does not tend to support the present award of $1.7 million in punitive damages, a sum 340 times the financial harm defendant's fraud caused plaintiff.

### D. *The Role Played by the Defendant's Financial Condition*

Plaintiff contends a substantial reduction will make the punitive damages so small as to be written off as a cost of doing business, negating the state's interest in deterring repetition or imitation of defendant's conduct. Defendant counters that after *BMW* and *State Farm,* the small size of an award in comparison to the defendant's financial condition is no longer a factor to consider in assessing excessiveness. We briefly address the question of a defendant's wealth or financial condition in relation to the state's interests in punishing and deterring a defendant's wrongful conduct.

█ Where the defendant's oppression, fraud or malice has been proven by clear and convincing evidence, California law permits the recovery of punitive damages "for the sake of example and by way of punishing the defendant." (Civ. Code, § 3294, subd. (a).) As we explained in *Neal v.*

---

[8] In *State Farm,* the high court explained the limited value of comparing punitive damages to criminal penalties: "The existence of a criminal penalty does have bearing on the seriousness with which a State views the wrongful action. When used to determine the dollar amount of the award, however, the criminal penalty has less utility. Great care must be taken to avoid use of the civil process to assess criminal penalties that can be imposed only after the heightened protections of a criminal trial have been observed, including, of course, its higher standards of proof." (*State Farm, supra,* 538 U.S. at p. 428.)

*Farmers Ins. Exchange, supra,* 21 Cal.3d at page 928, and *Adams v. Murakami, supra,* 54 Cal.3d at pages 110–112, the defendant's financial condition is an essential factor in fixing an amount that is sufficient to serve these goals without exceeding the necessary level of punishment. "[O]bviously, the function of deterrence . . . will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort." (*Neal v. Farmers Ins. Exchange, supra,* at p. 928.) "[P]unitive damage awards should not be a routine cost of doing business that an industry can simply pass on to its customers through price increases, while continuing the conduct the law proscribes." (*Lane v. Hughes Aircraft Co.* (2000) 22 Cal.4th 405, 427 [93 Cal.Rptr.2d 60, 993 P.2d 388] (conc. opn. of Brown, J.).) On the other hand, "the purpose of punitive damages is not served by financially destroying a defendant." (*Adams v. Murakami, supra,* at p. 112.)

 Due process does not preclude a state from using punitive damages for the purposes of deterrence. As the high court stated in *State Farm, supra,* 538 U.S. at page 416, " 'Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition.' " Indeed, in *BMW* the high court made clear that a court reviewing the jury's award for due process compliance, under its guideposts, should consider whether the level of punishment imposed is necessary to vindicate the state's legitimate interests in deterring conduct harmful to state residents. Acknowledging the state's interests in punishment and deterrence, the court continued: "Only when an award can fairly be categorized as 'grossly excessive' in relation to these interests does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment." (*BMW, supra,* 517 U.S. at p. 568.) After reviewing the three guideposts, the court held the award in *BMW* was excessive in light of the guideposts, even considering the state's interest in deterrence, because the record did not show "whether less drastic remedies could be expected to achieve that goal," that is, "whether a lesser deterrent would have adequately protected the interests of Alabama consumers." (*Id.* at p. 584.) Finally, the court indicated that on remand the Alabama Supreme Court was either to order a new trial or itself determine what award was "necessary to vindicate the economic interests of Alabama consumers." (*Id.* at p. 586.)

 Because a court reviewing the jury's award for due process compliance may consider what level of punishment is necessary to vindicate the state's legitimate interests in deterring conduct harmful to state residents, the defendant's financial condition remains a legitimate consideration in setting punitive damages. (See *State Farm, supra,* 538 U.S. at p. 428 [use of wealth as a factor not " 'unlawful or inappropriate' "].) The *State Farm* court, however, also emphasized that wealthy defendants are equally entitled to due

process and that "[t]he wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award." (*Id.* at p. 427.) Quoting from Justice Breyer's concurring opinion in *BMW*, the court disapproved using wealth as " 'an open ended basis for inflating awards' " and warned that wealth cannot replace reprehensibility as a constraining principle. (*State Farm, supra,* at pp. 427–428.)

Reading the high court's decisions as a whole, we agree with the Eleventh Circuit Court of Appeals that while wealth cannot substitute for the high court's guideposts in limiting awards, and cannot alone justify a high award, the guideposts were not intended "to prevent juries from levying awards that serve important state interests and provide a meaningful deterrent against corporate misconduct." (*Kemp v. American Telephone & Telegraph Co.* (11th Cir. 2004) 393 F.3d 1354, 1365.) The *BMW/State Farm* guideposts cannot be abandoned or ignored, but in determining whether a lesser award "could have satisfied the State's legitimate objectives" (*State Farm, supra,* 538 U.S. at p. 420), a reviewing court may nonetheless give some consideration to the defendant's financial condition.[9]

We need not in this case attempt to delineate the relationship between wealth and the *BMW/State Farm* guideposts under all circumstances. In some cases, the defendant's financial condition may combine with high reprehensibility and a low compensatory award to justify an extraordinary ratio between compensatory and punitive damages. (See, e.g., *Kemp v. American Telephone & Telegraph Co., supra,* 393 F.3d at pp. 1357, 1365 [where the defendant played a "critical role" in conduct of illegal gambling scheme, punitive damages of $250,000 on only $115 in compensatory damages were justified in part by need for "meaningful deterrent" to illegal conduct by large corporation].) In other cases, especially those involving substantial compensatory awards, the level of deterrence may be limited, after

---

[9] Accord, *Bardis v. Oates, supra,* 119 Cal.App.4th at page 26 (considering wealth for purpose of deterrence while recognizing that under *State Farm* "the wealth of a defendant will not *by itself* compensate for a lack of other factors"); *Bains LLC v. Arco Products Company, supra,* 405 F.3d at page 777 (wealth properly considered "in determining an award that will carry the right degree of sting," but cannot make up for absence of reprehensibility); *Kemp v. American Telephone & Telegraph Co., supra,* 393 F.3d at page 1365, footnote 9 (wealth cannot be sole basis for a large punitive damages award but is a "legitimate consideration" in determining reasonableness of jury's award); *Mathias v. Accor Economy Lodging, Inc., supra,* 347 F.3d at page 677 (while under *State Farm* "wealth is not a sufficient basis for awarding punitive damages," it may nonetheless be considered in relation to costs of obtaining compensation in litigation); *Hollock v. Erie Insurance Exchange, supra,* 842 A.2d at page 421 (same); *Eden Electrical, Ltd. v. Amana Company, L.P.* (N.D.Iowa 2003) 258 F.Supp.2d 958, 975 (reviewing court, in some circumstances, may "throw into the balance" the defendant's financial condition).

*State Farm*, to that provided "as a natural result of imposing damages over and above traditional compensatory damages, not from the imposition of sanctions in an individual case that are actually disabling to the defendant" (*Romo v. Ford Motor Co., supra*, 113 Cal.App.4th at p. 750); the state may have to partly yield its goals of punishment and deterrence to the federal requirement that an award stay within the limits of due process. But when, as in the present case, the reprehensibility of the defendant's conduct is relatively low, the state's interest in punishing it and deterring its repetition is correspondingly slight. Here, neither the interest in deterrence nor San Paolo Holding's substantial wealth can conceivably justify enforcing the jury's award of $1.7 million for a false promise that caused only a $5,000 injury.[10]

### III. *The Maximum Constitutional Award*

#### A. *Appellate Determination v. Remittitur*

Our review of the *BMW/State Farm* guideposts, even in light of California's interest in punishing and deterring fraudulent conduct, leads to the conclusion that the jury's award of $1.7 million in punitive damages is grossly excessive. The Court of Appeal erred in holding to the contrary. We could end our discussion here and remand to the Court of Appeal for that court to reduce the award to the constitutionally allowed maximum. But because this litigation has already lasted more than eight years, a process so far including two trips to the United States Supreme Court and three decisions by the Court of Appeal, we believe the better course is for this court itself to determine the maximum punitive damages award that satisfies the constraints of due process and to order the judgment reduced accordingly.

 Moreover, we agree with San Paolo Holding that the appropriate order is for an absolute reduction, rather than a conditional reduction with the alternative of a new trial, i.e., a remittitur. As constitutional excessiveness is a legal issue appellate courts determine independently (*State Farm, supra*, 538 U.S. at p. 418; *Cooper Industries, supra*, 532 U.S. at pp. 436–443), we do not, in determining the maximum constitutional award ourselves, decide any question of fact plaintiff has a right to have decided by a jury. (*Johansen v. Combustion Engineering, Inc.* (11th Cir. 1999) 170 F.3d 1320, 1331 (*Johansen*) ["Plaintiff's consent is irrelevant if the Constitution requires the reduction"]; *Leatherman Tool Group, Inc. v. Cooper Industries, Inc., supra*,

---

[10] This is true whether we use the $46 million San Paolo Holding had in 1996 or the $4.8 million it had in 1998, after transferring cash to its corporate parent. We consider the higher number more appropriate, however, because it more closely reflects San Paolo Holding's condition at the time of the tortious acts whose repetition or imitation the law seeks to deter.

285 F.3d at p. 1151 [following *Johansen*: "[A]n appellate court need not remand for a new trial in every case in which it finds that a punitive damages award exceeds the constitutional maximum. . . . We therefore will determine the constitutional maximum on the basis of the existing record"]; see, e.g., *Bardis v. Oates*, *supra*, 119 Cal.App.4th at pp. 26–27 [Court of Appeal reduced punitive damages award to due process limit and affirmed as modified, without offering the plaintiff a new trial alternative].)

Once a maximum constitutional award has been determined, moreover, a new trial on punitive damages would be futile. "Giving a plaintiff the option of a new trial rather than accepting the constitutional maximum for this case would be of no value. If, on a new trial, the plaintiff was awarded punitive damages *less* than the constitutional maximum, he would have lost. If the plaintiff obtained *more* than the constitutional maximum, the award could not be sustained. Thus, a new trial provides only a 'heads the defendant wins; tails the plaintiff loses' option." (*Johansen*, *supra*, 170 F.3d at p. 1332, fn. 19.)

## B. *Determination of Maximum Award*

To state a particular level beyond which punitive damages in a given case would be grossly excessive, and hence unconstitutionally arbitrary, " 'is not an enviable task. . . . In the last analysis, an appellate panel, convinced it must reduce an award of punitive damages, must rely on its combined experience and judgment.' " (*Leatherman Tool Group, Inc. v. Cooper Industries, Inc.*, *supra*, 285 F.3d at p. 1152.) The high court's due process analysis does not easily yield an exact figure: we must attempt to arrive at such a number using imprecisely determined facts and "applying guidelines that contain no absolutes." (*Continental Trend Resources, Inc. v. OXY USA, Inc.*, *supra*, 101 F.3d at p. 643.) An appellate court should keep in mind, as well, that its constitutional mission is only to find a level higher than which an award *may not* go; it is not to find the "right" level in the court's own view. While we must, under *Cooper Industries, supra*, 532 U.S. 424, assess independently the wrongfulness of a defendant's conduct, our determination of a maximum award should allow some leeway for the possibility of reasonable differences in the weighing of culpability. In enforcing federal due process limits, an appellate court does not sit as a replacement for the jury but only as a check on arbitrary awards. (See *BMW, supra*, 517 U.S. at p. 568 ["States necessarily have considerable flexibility in determining the level of punitive damages they will allow . . . in any particular case"].)

Referring to our earlier reprehensibility analysis and using the comparisons to compensatory damages and civil penalties for calibration, we conclude the maximum here lies at $50,000, or 10 times the compensatory award. This

amount, we believe, will "further [California's] legitimate interests in punishing unlawful conduct and deterring its repetition" (*BMW, supra,* 517 U.S. at p. 568)—interests limited here by the relatively light culpability of the conduct—without exceeding a level "both reasonable and proportionate to the amount of harm to the plaintiff" (*State Farm, supra,* 538 U.S. at p. 426).

▆ We have already explained the reasons for our evaluation of San Paolo Holding's reprehensibility as low, and the presumption against awards significantly exceeding a single-digit multiplier of the actual or potential harm inflicted. (See pts. II.A. & II.B., *ante.*) In *State Farm,* the high court made clear that due process permits a higher ratio between punitive damages and a small compensatory award for purely economic damages containing no punitive element than between punitive damages and a substantial compensatory award for emotional distress; the latter may be based in part on indignation at the defendant's act and may be so large as to serve, itself, as a deterrent. (*State Farm, supra,* 538 U.S. at pp. 425–426.) Here the $5,000 award was for purely economic damages containing no punitive element and is quite small. Yet the compensatory award here, as earlier discussed, did accurately measure the injury proven to have been inflicted. (See pt. I., *ante.*) This was not a case where the harm could not be quantified and only nominal damages were awarded. (See, e.g., *DiSorbo v. Hoy, supra,* 343 F.3d at p. 187.) The nature and size of the compensatory award here thus militates for a maximum award at the top of, but not significantly beyond, the single-digit range.

A penalty of $50,000, though just exceeding the largest single-digit ratio amount, is in absolute size not extraordinary for fraudulent conduct. (See, e.g., *Mathias v. Accor Economy Lodging, Inc., supra,* 347 F.3d at pp. 677–678 [upholding $186,000 in punitives on a $5,000 compensatory award against wealthy corporate defendant for outrageous but not very harmful behavior]; *McClain v. Metabolife International, Inc., supra,* 259 F.Supp.2d at p. 1235 ["Seventy-five thousand dollars would probably not be excessive in any gross fraud case, no matter how inconsequential the actual damages were"].) But neither is it so minor, even accounting for San Paolo Holding's wealth, that it can be completely ignored, especially when imposed for conduct that led to no profit for the company; even a prosperous company would ordinarily take reasonable measures to prevent the recurrence of a $50,000 net loss. (See, e.g., *Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1255 [1 Cal.Rptr.2d 301] [$2 million award "sends a forceful message" even to defendants worth $500 million].)

We therefore conclude $50,000 is, considering all the circumstances of this case, the maximum award of punitive damages consistent with due process.

## DISPOSITION

The judgment of the Court of Appeal is reversed. The matter is remanded to the Court of Appeal with directions that it modify the superior court judgment to reduce the award of punitive damages to $50,000 and affirm the judgment as modified.

George, C. J., Kennard, J., Baxter, J., Chin, J., Brown, J., and Moreno, J., concurred.