Filed 7/30/15  Hetrick v. Clusin CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| JANE HETRICK,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>WILLIAM CLUSIN,<br><br>    Defendant and Appellant. | H038435<br>(Santa Clara County<br>Super. Ct. No. CV149265) |

Plaintiff Jane Hetrick brought this action for damages, alleging that defendant induced her to enter into an intimate relationship by fraudulently assuring her that he was free of sexually transmitted diseases, specifically including genital herpes.  In a nonjury trial, plaintiff adduced evidence tending to establish, among other things, that defendant knew he had transmitted genital herpes to two previous wives.  The trial court awarded compensatory and punitive damages to plaintiff.  Appearing pro se, defendant contends that the judgment is unsound for various reasons.  We detect no error.  Accordingly, we will affirm.

BACKGROUND

Plaintiff is a retired professor.  Before she met defendant, she had never been married and had borne no children.  She testified that she had had relatively few sexual partners, and no reason to think any of them were infected with any sexually transmitted

disease (STD). She was particularly concerned about such diseases, and especially herpes, because a brother had nearly died from herpes-related encephalitis. Accordingly, when contemplating possible physical intimacy, her practice was to ask whether the prospective partner had any STDs, specifically including herpes. When one potential suitor acknowledged that he had an STD, plaintiff stopped dating him. Her medical expert opined that, to a reasonable degree of medical certainty, plaintiff was not carrying HSV-2—the virus generally implicated in genital herpes infections—when she met defendant. Defendant cites no evidence to the contrary.

Defendant holds both a medical degree and a Ph.D. in molecular biology. In 1981, after a residency at Stanford University in internal medicine, he became a board certified specialist in that field. Since 1983 he has been a member of the faculty at a prominent medical school.[1]

Plaintiff and defendant met at a gathering of single professionals on January 4, 2004. Plaintiff was then 50 years old. Defendant was apparently about a half-decade older.[2] Both were interested in having a child. Plaintiff testified that when they began dating seriously, she followed her usual practice by asking defendant whether he had any sexually transmitted diseases, including genital herpes. He replied "absolutely not, that he did not have genital herpes or any STD." They thereafter commenced an intimate relationship. In 2005, they entered into a surrogacy agreement with a designated

---

[1] In an effort to deflect any inference that he possessed special knowledge concerning genital herpes infections, defendant asserts that from 1982 on, his "clinical practice was limited to cardiology." In his "corrected" reply brief, he describes himself as "a practicing cardiologist, who had been certified in internal medicine in the past." Insofar as this is intended to mean that he was no longer qualified to practice internal medicine, the assertion fails for want of any supporting citation to the record.

[2] Defendant testified that he went directly to undergraduate school after his junior year of high school and graduated in 1970. Assuming he spent four years as an undergraduate, he would presumably have been born around 1949.

2

surrogate mother and her husband under which defendant's sperm would fertilize a donated egg for gestation in the womb of the surrogate mother. As called for in the agreement, plaintiff and defendant were both tested for sexually transmitted diseases. They were not, however, tested for HSV-2, apparently because it cannot be transmitted through gestational surrogacy.

The parties were married on March 31, 2007. In August of that year, plaintiff was told by one of defendant's sons from a previous marriage that defendant had infected the son's mother— defendant's then-wife—with genital herpes. Plaintiff informed defendant of the accusation and asked if it was true. He denied it nonchalantly, minimizing its seriousness. At her insistence, they were both tested for HSV-2—he on August 30, and she on September 13. Both tests were positive. When plaintiff showed her results to defendant, he exhibited not surprise, but indifference. Nor did he manifest concern about his own positive result. He showed no interest in where the infection had come from. When she directly accused him of infecting her, he did not deny it. Instead he suggested that since they were both already infected, their sexual relationship should continue.

By the time this conversation took place, plaintiff already considered the marriage over. She had asked defendant to leave, and had consulted an attorney. Their divorce became final in November 2008.

Plaintiff filed this action on August 6, 2009, asserting numerous theories of recovery sounding primarily in fraud and personal injury. The matter was tried without a jury, resulting in a judgment awarding plaintiff $500,000 in general damages, $11,500 in special damages, and $398,400 in punitive damages.

## DISCUSSION

### I. Appellate Irregularities

Defendant's briefs fail to conform to many requirements imposed by the rules of court. After plaintiff filed her brief, pointing these matters out, defendant filed a reply

brief containing similar irregularities, and then moved to file a "corrected" reply brief—a motion we granted, although the "corrected" brief is itself woefully deficient and is less a reply to plaintiff's brief than an attempt to clarify the arguments presented in the opening brief.

Our system demands of each party to an appeal that every assertion of fact be supported by a citation to the point in the record where that fact is substantiated, and that every assertion of law be supported by pertinent authority, argument, or both. (See Cal. Rules of Court, rule 8.204(a)(1)(B), (C).) Defendant makes a few attempts to comply with these requirements, but mostly honors them in the breach. The table of authorities in the opening brief lists 10 statutes, one local rule, and four cases. Only two of the four cases are properly cited in the table, though one of these is cited only by name in the text. The other two cases—one from Ohio, and one from the United Kingdom—are identified only by name (in the latter case) or by name and docket number (in the former). No page references are provided in the table of authorities, so anyone wondering where and why a statute is cited must search the entire brief to find it.

The brief also fails to articulate separate arguments under separate headings, as required by California Rules of Court, rule 8.204(a)(1)(B). Defendant appears unwilling or unable to distill his complaints into logical, which is to say syllogistic form, and separate them into a coherent structure. Instead the opening brief consists of 37 pages of meandering commentary under the heading "Statement of Case and Appealability," followed by 11 pages of numbered paragraphs purportedly consisting of "Arguments," but more accurately described as clusters of loosely associated protests.

Rather than attempt to further catalog specific irregularities here, we will note them in the discussion below as and when they become relevant to our determination of the appeal.

4

Counsel for plaintiff has asked us to take judicial notice of a decision in which, more than a year before defendant filed his opening brief here, the First Appellate District chided him for violations resembling those in evidence here. (Marriage of Hetrick, No. A131586, filed Jan. 23, 2012.) We decline the implicit suggestion that we should impose sanctions. Though an order to that effect would no doubt be justified, we have concluded that plaintiff is sufficiently sanctioned by the judgment in this case, which we will affirm.

## II. *Improper Expert Testimony*

Defendant's first enumerated "Argument[]" consists of a complaint that plaintiff's medical expert, Richwald, committed "fraud" on the stand, in that he "purported to have done . . . formal pre-trial medical evaluations" of defendant's three former wives, but "[a]ll he actually did was review their blood test results, read complaints or declarations prepared for them by counsel, and interview them half way through the trial . . . ." Defendant complains that the mid-trial interviews took place only after "they had just heard two other ex-wives testify after the Plaintiff's inflammatory opening statement." Defendant suggests that Richwald's evidence should have been "stricken," in which case "there would be no basis for a decision."

In support of this argument defendant cites a page of testimony elicited by him from Richwald, in which the latter said that he had spoken to the ex-wives at the direction of plaintiff's attorney and that the conversations were not recorded or transcribed. We fail to see how these facts point to any weakness in the witness's testimony, but we need not examine the question closely because all such arguments should have been addressed to the trial court, which was "the sole judge of the weight of the evidence." (*Foshee v. Wolters* (1948) 86 Cal.App.2d 766, 770; see *Darr v. Clevelin Realty Corp.* (1939) 33 Cal.App.2d 500, 507 ["The weight and intrinsic value of this and other evidence supporting respondent's claims, as well as the credibility of the witnesses who testified in

the case, were all matters for determination by the trial court, and . . . such determination cannot be disturbed on appeal unless we can say as a matter of law that there was no substantial evidence in the record to support the findings of the trier of facts."].)

Plaintiff's suggestion that the evidence should have been stricken implies that it was subject to exclusion under the rules of evidence. He neither identifies nor proposes any rule or principle that would or should produce such a result. Moreover he points to no objection in the trial court by which he preserved the right to challenge this evidence on appeal. Such a challenge generally requires that the appellant not only lodge an appropriate objection in the trial court (Evid. Code, § 353, subd. (a)), but also " ' "cite to the record showing exactly where the objection was made" ' " (*Colombo v. BRP US Inc.* (2014) 230 Cal.App.4th 1442, 1478, quoting *Dietz v. Meisenheimer & Herron* (2009) 177 Cal.App.4th 771, 799-800). Defendant has made no attempt to comply with these requirements. Accordingly we cannot entertain any claim that the admission of the challenged testimony constituted error.

### III. *Excluded Evidence*

Defendant next asserts that the trial court "unreasonably excluded or refused to accept or read key evidentiary documents submitted by the Defendant." The affected documents "included a letter from the Defendant's physician . . . , and certain documents . . . included as exhibits with a Motion for Summary Judgment." He adds that he was "improprerly [*sic*] prevented from showing these documents to a witness, even though one exhibit from the Motion for Summary Judgment was admitted into evidence."

No citation to the record is provided, no supporting authority is cited, and no indication is given of what the excluded materials were offered to prove. Before a judgment may be reversed for erroneous exclusion of evidence, it must "appear[] of record" that, among other things, "[t]he substance, purpose, and relevance of the excluded evidence was made known to the [trial] court" (Evid. Code, § 354, subd. (a)), or

6

that compliance with this requirement was "futile" (*id*., subd. (b)). Again, defendant directs us to nothing in the record tending to satisfy this requirement. We note that, based on his description alone, the excluded material would seem to constitute hearsay. It was thus quite properly excluded unless defendant communicated to the court some nonhearsay purpose for which the evidence was offered. Since defendant directs us to nothing in the record that would satisfy this requirement, he raises no cognizable claim of error.

## IV. *Failure to Arbitrate*

Defendant next offers an argument to the apparent effect that plaintiff's claims are barred by her failure to submit them to arbitration. The argument seems to proceed as follows: (1) the failure to test the parties for genital herpes during the surrogate parenting process constituted a breach of the surrogacy contract; (2) that contract included a clause by which the parties agreed to submit any dispute arising from the contract to mediation, and if that failed to arbitration; (3) plaintiff's claims are governed by this provision; and (4) her failure to arbitrate them bars the judgment.

This argument fails for many reasons. First, it does not appear that plaintiff's claims depend in any sense on the surrogacy agreement, or any supposed breach thereof. The complaint alludes to the agreement, but only as a *product* of the fraud practiced upon plaintiff by defendant. One implication of this treatment is that plaintiff's consent to the arbitration clause, as to the agreement as a whole, was procured by fraud, which vitiates its binding effect on her.

It also appears unlikely that the failure to test for genital herpes constituted a breach of the surrogacy agreement by the parties or anyone else. The provision cited by plaintiff states that each party shall undergo "testing for all kinds of venereal disease, including HIV and AIDS, *in order to protect the health of the Surrogate and Child*." Apparently the trial court heard evidence that genital herpes would not pose a threat to

7

either the surrogate or the child; that is apparently why it was not tested for. It is therefore doubtful that the failure to test for genital herpes breached the agreement; it is even more doubtful that it breached any contractual obligation running *between plaintiff and defendant*. The apparent intention of both parties was to subject themselves to a testing regimen as prescribed by those administering the surrogacy arrangement. Neither party would breach such an agreement merely because the administrators failed to test for a particular disease.

Such observations are academic, however, because an arbitration clause bars litigation only if it is seasonably invoked by one of its beneficiaries. The code specifies a procedure for demanding arbitration and for petitioning to compel same against another party. (Code Civ. Proc., §§ 1280 et seq., 1281.2.) Failure to seek such relief in a timely fashion effects a forfeiture of the right to arbitrate. (*Spear v. California State Auto. Assn.* (1992) 2 Cal.4th 1035, 1043; see Code Civ. Proc., § 1281.2, subd. (a).) We are directed to no evidence that defendant ever demanded arbitration, let alone filed a petition to compel compliance with such a demand. That he did not do so is inferable from his incorrect assertion that it was *plaintiff's* "duty to request mediation or arbitration." If defendant wished to arbitrate the dispute, it was incumbent upon him to seek arbitration in a timely manner. Having failed to do so, he cannot assert such a right now.

Defendant also alludes to the surrogacy contract's provision that failure to *mediate* disputes between the parties would bar an award of attorney fees under the contract. As discussed in somewhat greater detail below (pt. XV, *post*), this provision has no apparent bearing on the judgment under review.

## V. Statute of Limitations

In a six-line paragraph devoid of citation to authority or evidence, defendant contends that reversal is warranted "based on expiration of the statute of limitations." Again numerous dubieties arise from defendant's own characterizations. He apparently

8

assumes that (1) plaintiff's claims were governed by a two-year statute, and (2) her time to sue began to run when the parties stopped having sexual intercourse. The first point appears debatable; the case may well be governed not by the two-year statute for personal injury actions (Code Civ. Proc., § 340), but by a more specific statute applicable to actions for "injury or illness based upon exposure to a hazardous material or toxic substance" (*id*., § 340.8, subd. (a)), which imposes as a two-year limitation running from the date when the plaintiff had "inquiry notice" of the injury and its having been caused by the wrongful act of another. The judgment also appears to rests on claims for fraud, which would be governed by a three-year statute. (See Code Civ. Proc., § 340.)

But the legal uncertainties again appear moot because, as a reviewing court, we are obliged presume that the trial court found that plaintiff's cause of action arose within the two years preceding her filing of the action. (See *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 ["A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness."]; 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 355, p. 409.) Such a finding seems entirely consistent with such evidence as has been brought to our attention. The usual rule for personal injury actions is that the cause of action does not accrue until the plaintiff forms, or should have formed, a "suspicion of wrongdoing." (3 Witkin, Cal. Procedure (5th ed. 2008) Actions, § 500, p. 641.) There is no reason to suppose, and we do not understand defendant to even assert, that plaintiff should have entertained such a suspicion before defendant's son told her that defendant had infected a previous wife with genital herpes. As defendant concedes, the record contains evidence that this occurred on August 7, 2007. The complaint was filed two years later, on August 6, 2009. Defendant makes some attempt to suggest that the relevant conversation might have occurred a few days earlier, but again we must presume the judgment is supported by a

9

contrary finding, and that the finding is supported by substantial evidence. (See 9 Witkin, *supra*, Appeal, § 355, p. 409.)

Further, we doubt—and defendant's meager showing fails to establish—that the conversation with the son imparted enough notice of enough facts to commence the statutory period. At that point, plaintiff did not know she had been physically injured—only that she had been lied to. Until her own test for the virus came back positive, she could have claimed no more than *injuria absque damno*—"wrong without damage," the invasion of a legal right with no concrete consequential detriment—for which a civil action would not lie. (See *Fields v. Napa Mill. Co.* (1958) 164 Cal.App.2d 442, 447 ["It is fundamental that a negligent act is not actionable unless it results in injury to another . . . ."].) She only learned that she had in fact been damaged—had contracted genital herpes—some six weeks after her suspicions were aroused, and well inside the two years preceding the filing of the complaint.

No error appears in the trial court's failure to sustain the limitations defense.

## VI. Summary Judgment

### A. Failure to Issue "Report"

Defendant offers a tangled cluster of grievances concerning the trial court's treatment of his motion for summary judgment. In his "corrected" brief he attempts to distill these grievances into a sentence, which itself requires considerable unpacking: "The [claimed] errors are that no report was issued by [law and motion] Judge Kirwan, as required by CCP section 437c, and also that [trial] Judge Barnum refused to look at the court file which contained both the motion for summary judgement and Plaintiff's opposition (which was not served on the Appellant or filed with Respondents' Brief in this appeal)."

This sentence suggests four grounds of complaint. First is that the law and motion judge erred by not issuing, in a timely fashion, a "report" as assertedly required by the

10

statute governing summary judgment.  This proposition apparently rests on Code of Civil Procedure section § 437c, subdivision (g), which requires the court, when denying a motion for summary judgment, to "specify one or more material facts raised by the motion as to which the court has determined there exists a triable controversy," making "specific[] refer[ence] to the evidence proffered in support of and in opposition to the motion which indicates that a triable controversy exists."  Defendant posits that this "report" is intended to serve as "a guideline for the trial by the parties or attorneys and by the Judge who hears the trial."  This reading is imaginative, but wholly unsupported by authority.  The function of a motion for summary judgment is to determine whether the lawsuit, or one or more causes of action or defense, can be disposed of *as a matter of law*, i.e., without taking testimony and receiving other evidence through the more laborious and expensive mechanisms of trial.  The provision cited by defendant is intended to facilitate *appellate review* of the *order denying summary judgment*—not to govern, or even affect, the further progress of the case in the trial court.  (See 6 Witkin, Cal. Procedure (5th ed. 2008) Proceedings Without Trial, § 250, p. 696.)  A failure to state reasons is thus pertinent only if it prejudices the aggrieved party *on appeal*.  (See *Santa Barbara Pistachio Ranch v. Chowchilla Water Dist.* (2001) 88 Cal.App.4th 439, 448-449.)  Defendant makes no attempt to show that the denial of his motion was itself error.  Therefore any deficiency in the order effecting that denial is immaterial.

Here it is impossible to determine whether any such deficiencies existed because we are not directed to the offending order.  Defendant does not provide any citation to it, and we find no reference to it in the index to his appendix.  We can only suppose it is absent from the appellate record.  In his brief he refers to entries in the trial court's online docket, but those entries are not properly before us and cannot substitute for a proper appellate record.

11

Defendant also seems to complain that the court did not rule on the motion for summary judgment until after trial had commenced. But the court was entitled to take the motion under submission for up to 90 days. (See Cal.Const., art. 6, § 19; Gov. Code, § 68210; *In re Jensen* (1978) 24 Cal.3d 72, 73.) By defendant's own account, the motion was under submission for a mere 21 days. If defendant wished to secure an earlier ruling, it was incumbent upon him to file an earlier motion, or take steps to ensure that the motion was heard and submitted at an earlier time. He complains that the calendar department—presumably meaning the calendar clerk—told him his motion was being set on the earliest available date. He makes no attempt to explain why the motion was not filed earlier. In any event, the clerk does not have the last word on such matters. If defendant wished to ensure that the motion was heard more than 45 days before trial, his remedy was a motion to set the motion on an earlier date.[3]

## B. *Failure to Treat Motion as Evidence*

Defendant also complains that the trial judge failed to take due note of his motion for summary judgment and the materials submitted in its support. Again the grievance rests on a fundamental misconception—in this case, that the summary judgment motion was some kind of preface, on which defendant was entitled to build his defense at trial. That is not the case. The motion for summary judgment was a law and motion matter governed by evidentiary and procedural principles peculiar to such matters. (See, e.g., Code Civ. Proc., §§ 2009, 2015.5 [authorizing use of affidavits and declarations as evidence "upon a motion"].) Most significantly, it was to be determined entirely on declarations and other documentary evidence (Code Civ. Proc., § 437c, subd. (b)(1)), *all*

---

[3] Apparently meaning to suggest that he was unfairly surprised by the trial court's actions, defendant asserts that "[u]sually, the Judge who hears the Motion for Summary Judgement is the same Judge who tries the case." This statement may be true in some courts, but not in those of Santa Clara County.

12

*of which were inadmissible at trial* unless an adequate foundation was laid by live witnesses or stipulation *and* the evidence was brought within an exception to the hearsay rule. (See Evid. Code, §§ 1200 et seq.) A court trying a case is thus not only *entitled* to ignore a motion for summary judgment that has not been granted; it is, upon proper objection, *required to do so*.[4]

## C. Irregularities Regarding Opposition to Motion

Defendant asserts that plaintiff's opposition to the motion for summary judgment "was not served on the Appellant." Since no record citation is provided we must presume either that this objection was raised below and resolved against defendant for good and sufficient reasons, or that it was not raised below and has therefore been forfeited on appeal. This leaves the suggestion that plaintiff's opposition to the motion "was not . . . filed with Respondent's Brief in this appeal." Whatever the intended significance of this assertion, it cannot point to error. It is appellant's burden, not respondent's, to present an adequate record to sustain his claims of error. (*Hernandez v. California Hospital Medical Center* (2000) 78 Cal.App.4th 498, 502; *Ballard v. Uribe* (1986) 41 Cal.3d 564, 574-575.) Indeed the appellant must affirmatively demonstrate not only error, but prejudice. (*In re Marriage of McLaughlin* (2000) 82 Cal.App.4th 327, 337, quoting *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 105 [" 'the appellant bears the duty of spelling out in his brief exactly how the error caused a miscarriage of justice' "].) Defendant has carried no part of this burden with respect to the trial court's treatment of his motion for summary judgment.

## VII. Noncompliance With Local Rule

Defendant complains that the trial court relied on a local rule with the result that "[d]efendant's evidence was unreasonably excluded." As set forth in his opening brief

---

**4** If a motion for summary *adjudication* is *granted*, of course, due account of it must be taken in any ensuing trial. (See Code Civ. Proc., § 437c, subds. (*l*), (n).)

13

this point is unintelligible. In his "corrected" reply brief he only compounds the problem by alluding vaguely to another part of the brief supposedly containing "citations to portions of the trial where the objection was made by both parties during the trial." This is followed by a reference to an unspecified footnote in an unidentified document described as containing record citations, whence the discussion veers into references to a "pretrial telephone call from the court, concerning the correct time and place for lodging of pretrial [*sic*], [that] was never made," and to a court employee's failure to disclose "the Court's policies regarding cases on 'Standby.' " From this and other comparably cryptic remarks we surmise that defendant was surprised at trial by a requirement that exhibits he intended to offer into evidence be disclosed, exchanged, or otherwise handled in some specified respect prior to trial. He takes exception to the court's actions on the grounds, apparently, that the local rule producing this result was violated by the court, inadequately disclosed to him, or both. He also suggests that the table of contents in his motion for summary judgment constituted compliance with the rule. We can make very little of this discussion, but we can confidently state that nothing properly included in a motion for summary judgment can satisfy a requirement that a party disclose the documentary exhibits he or she intends to introduce at trial.

## VIII. *Unfair Odds*

In his opening brief defendant asserts that "a self represented person should not have to compete with a team of attorneys under time pressure." In his reply brief he explains this as meaning "that he was not given sufficient time to prepare his case." He cites a passage in the trial record in which he objected to the court's proposed trial schedule on the basis that his busy schedule would not permit him to comply with it. The court generously construed these remarks as a motion to continue the trial, which it denied, stating, "I find no good cause." Defendant makes no coherent challenge to this ruling. Indeed, he does not acknowledge it. No error, or claim of error, appears.

14

## IX. *Special Verdict Forms*

Defendant complains that "the Plaintiff was allowed to submit two special verdict forms (one with 19 for questions for jurors and a later one with 31 questions) and choose at close of trial which form the Judge was to use." The apparent gist of his argument is that by permitting a modification of the verdict form, the court somehow violated Government Code section 6200, subdivision (a), which makes it a crime for the custodian to "secrete" an official record. This assertion is unintelligible. To "secrete" a court record would presumably entail removing it from the court's file and disposing of it in some manner rendering it inaccessible to others. The copies of the two special verdict forms in the appendix do not bear a filing stamp, so it is impossible to say that they ever became official records. Assuming one of both of them was in fact filed with the court, there is no reason to suppose it was thereafter "secreted" by the court or anyone else. Defendant also refers to a local rule requiring the lodging of certain documents, including "proposed special verdicts," on the last court day before the trial date. (Santa Clara Superior Court Civil Rules, rule 9(D)(5).) Apparently the suggestion is that the later of the forms proffered by plaintiff could not have complied with this requirement, and the earlier form probably did not either. By its terms, however, the rule only governs "unless otherwise ordered by the Court." (*Id.*, rule 9(D).) Nor is there any attempt to show that defendant suffered prejudice from any the court's acceptance and use of these materials.

Defendant next suggests that the use of a special verdict "violates due process because it is really a list of Plaintiff's facts, (to be voted yes or no) presented as if they were counts in an indictment. The Defendant, should have had a similar opportunity to have his facts voted on." Here the form was not really a *verdict* at all, there being no jury, but was apparently adopted by the court as an outline of issues to be determined. The fairness of this procedure is the kind of question entrusted to the trial court's discretion, and defendant makes no attempt to identify specific deficiencies in the form.

15

Nor does he substantiate the suggestion that he was not afforded a fair opportunity to be heard and participate in the formulation of an appropriate "verdict."

## X.  Treatment of Documents

Defendant complains that "the trial Judge did not read or said he did not read, documents in the court file that he was obligated to read." He does not cite any page in the record where such statements might be found, and concedes the court *did* read one of the documents in question—the complaint—though "only after he received it from Plaintiff's counsel." He also uses this occasion to return to the theme that the court improperly refused to consider some of the attachments to defendant's motion for summary judgment. As we have said, the motion was not evidence for trial purposes, except as it might constitute or contain express or adoptive admissions offered *against* defendant. (See Evid. Code, §§ 1220, 1221.) If defendant wished to have the motion's exhibits considered at trial, it was his burden to separately offer them into evidence and lay a proper evidentiary foundation for their admission.

## XI.  Double Jeopardy

Defendant asserts that principles of double jeopardy were offended by "the overlapping and conflicting roles and rulings" of two named judges. This is followed by a baffling account of how the case was assigned to a department for trial. We need not attempt to unravel this account because " '[t]he protections of the [double jeopardy clause] are not triggered by litigation between private parties.' " (*Shore v. Gurnett* (2004) 122 Cal.App.4th 166, 171, quoting *United States v. Halper* (1989) 490 U.S. 435, 451, overruled on another point in *Hudson v. United States* (1997) 522 U.S. 93, 101-103.)

## XII.  "Untriable" Case

Defendant asserts that the case was "untriable" due to "the death of key witnesses and the fact that living witnesses were required to remember events from thirty years ago." This is not a claim of error.

16

## VIII. Bias

Defendant asserts, "Reversal is requested on the grounds of bias by the Trial Judge, who treated Plaintiff's counsel as a professional colleague, and agreed with Plaintiff's counsel that a witness who did not testify would have testified that the Appellant was a liar . . . ." He cites five pages of trial transcript, in which the court apparently sustained an objection by defendant, on grounds of privilege, to testimony by another doctor about statements defendant made to him while under treatment. In the portion most specifically alluded to by defendant, counsel for plaintiff described testimony on some previous occasion to the effect that the witness "fired [defendant] as a patient because [defendant] lied to him and that he lies repeatedly when he's threatened because of his sense of entitlement, because of his superior intellect, because of his status as a Stanford doctor. That with—anything threatens him, his response is to lie and he lied to [the witness]. And on that basis, [the witness] fired him." Counsel went on to observe that "[p]art of our case is [defendant] lied to [plaintiff]." The court replied, "You're welcome to show as much lying as you want. But if the defendant asserts a privilege, I have to rule on that . . . ." The reference to "lying" was not a description of defendant's conduct as then understood by the court but a description of something plaintiff's counsel was entitled to attempt to prove. Far from showing bias or favoritism towards plaintiff's counsel, this passage makes it quite clear that the court was scrupulously applying the law to the issues before it.

Defendant faults the judge for "accept[ing] a claim by the Plaintiff's expert that the Appellant had medicated his penis with a drug for genital herpes from 1979 to 1981 even though that drug that was not available until 1982." On the cited page of the transcript, the witness testified that he relied in part on defendant's "self-medication," as described by an ex-wife, for his opinion that defendant was infected with genital herpes at the time of that earlier marriage. There is no indication that the court "accepted" this

17

testimony, unless in the sense that it allowed it into evidence—which cannot constitute reversible error, since defendant did not object to it. (Evid. Code, § 353, subd. (a).) Whether the court went on to credit the expert's opinion is another question which defendant never answers in a way that would justify serious examination of the question on appeal. Suffice to say that nothing in the testimony cited by defendant establishes that the witness believed defendant was medicating himself *with Zovirax*, as his argument assumes. (See pt. XVI(A), *post*.)

Defendant cites, as indicative of bias, the judge's "refusing to look at the Appellant's Answer until the end of the trial when it was read into the record." He cites a portion of the record where he went through the answer attempting to show how its contents had been substantiated by the evidence at trial. But he cites no record support for the assertion that the court "refus[ed] to look at" the pleading before that time. In any event, the only pertinence of the pleadings at trial is to *frame the issues* to be tried by the court. In the abstract, no reversible error can arise from "refusing to look at" an answer, as distinct from refusing to acknowledge pertinent contents such as an affirmative defense or the denial of particular allegations of the complaint.

## XIV. *Compensatory Damage Award*

Defendant asserts that the award of $500,000 in general damages is excessive "because the Plaintiff has no symptoms, medical costs, or physical limitations and did not lose time from work." Characteristically, no record citation is provided for these assertions; nor are we directed to any indication of the basis on which the trial court determined the size of the award. Defendant's remarks on the subject do not amount to a prima facie claim of error. We will not search the record to ascertain whether there might be some substance to his complaints. (*Calada Materials Co. v. Collins* (1960) 184 Cal.App.2d 250, 254.) " '[I]t is the appellant's responsibility to affirmatively demonstrate error . . . by citation to the record and any supporting authority. In other

18

words, review is limited to issues which have been adequately raised and briefed.' [Citation.]' " (*Bains v. Moores* (2009) 172 Cal.App.4th 445, 455

Defendant challenges the award of $11,000 in special damages on the ground, apparently, that this represented the cost of the parties' wedding, and that there was no basis to treat that expenditure as an element of damages. We presume the court viewed that expenditure as the direct result of defendant's fraud, in that plaintiff would not have married him—and would not have incurred the cost of doing so—had he not deceived her. In opposing this treatment defendant presents nothing resembling a syllogistic argument. He seems to suggest that the wedding was attributable to the parties' surrogacy agreement, the surrogate mother's pregnancy, or both. We fail to see how this would detract from the award, since those events too were direct results of defendant's deceit. He implies that the court's acceptance of this claim of damage was inconsistent with its rejection of others, but we fail to see how that fact—even if competently demonstrated, which it is not—could be found prejudicial to him. Finally he suggests that marriage may have been necessary to confer defendant's surname on the child. What he means by this statement is a mystery, but in fact marriage was *not* necessary to give the child defendant's surname, provided the parents agreed to do so. If they did not agree, the question would be governed by the rule that "quarrels concerning a child's surname should be decided according to the best interests of the child." (*In re Marriage of Schiffman* (1980) 28 Cal.3d 640, 642; see *In re Marriage of Douglass* (1988) 205 Cal.App.3d 1046.)

## XV. Attorney Fees

Defendant asserts that the judgment should be "reduced by the amount conventionally awarded for attorney's fees (one third)." This conclusion, he asserts, flows from the surrogacy agreement's provision that failure to mediate disputes will forfeit any right to recover attorney fees *under the agreement*. But as we have noted, it is

19

doubtful that the surrogacy agreement has any bearing on plaintiff's claims against defendant. Beyond that, we fail to see how the cited clause, or anything else in the agreement, could affect the rights and duties flowing between plaintiff and her own attorneys. As previously noted, the cited provision appears to bar an *award* of attorney fees *incurred by prevailing party* who has failed to invoke the contract's provision for alternative dispute resolution. Since no fees were awarded to plaintiff, this provision appears entirely irrelevant.

## XVI. Punitive Damages

### A. Sufficiency of Evidence of Reprehensible Conduct

Defendant contends that the punitive damages award should be reversed because "there is no basis for punitive damages." He asserts that in his motion for summary judgment, he acknowledged that "he now has a duty to warn any future sex partners about his positive blood test." That recapitulation does not precisely track the statement in the motion, which is framed as an abstract legal proposition. But either way it misconceives the function of exemplary damages, which as the name says, seek not only to deter the defendant's own repetition of reprehensible conduct but also to convey the message to others in similar circumstances that the adverse fiscal consequences of such conduct may go beyond compensation for the measurable harm actually inflicted. Defendant asserts that the award here could have no such effect because "[t]his case was not publicized and the punitive damages would not encourage others to warn their sexual partners about Herpes . . . ." There is no requirement that an award of punitive damages be published in the official reports or otherwise receive any particular degree of notoriety.

Defendant asserts that the only "basis for punitive damage" at trial was "[c]laims" that he was medicating himself for genital herpes with an anti-viral drug (Zovirax) as early as 1979" and that he "had knowledge of the infection before the blood test in 2007." These claims, he writes, "were refuted at trial." But an appellate court cannot and will

20

not retry the case or second-guess the trial court's resolution of disputed issues of fact. (See *Morgan v. Imperial Irrigation Dist.* (2014) 223 Cal.App.4th 892, 912 [reviewing courts "do not take new evidence or decide disputed issues of fact "].) The closest we can come to such a function is to evaluate the sufficiency of the evidence to support a challenged finding. As a reviewing court, however, we " ' "must *presume* that the record contains evidence to support every finding of fact . . . .' " [Citations.] It is the appellant's burden, not the court's, to identify and establish deficiencies in the evidence. [Citation.] This burden is a 'daunting' one. [Citation.] 'A party who challenges the sufficiency of the evidence to support a particular finding must *summarize the evidence* on that point, *favorable and unfavorable,* and *show how and why it is insufficient.* [Citation.]' [Citation.] '[W]hen an appellant urges the insufficiency of the evidence to support the findings it is his duty to set forth a fair and adequate statement of the evidence which is claimed to be insufficient.' [Citation.]" (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409; *City of Hollister v. Monterey Ins. Co.* (2008) 165 Cal.App.4th 455, 484.)

Defendant acknowledges only a handful of the items of evidence against him bearing on the reprehensibility of his conduct. His most prominent challenge aims at the testimony by his first wife that she saw him applying a topical medication to sores on his penis. Defendant attacks that testimony by attributing to it a meaning it does not have, i.e., that he was treating himself *with Zovirax*, a medication which, he asserts, was not available until 1982, after the described events. But there is no basis to assume the witness was talking about Zovirax. She testified that she did not know what the medication was, recalling only that it came from a silver tube with a white label, which she believed was a prescription label. She further testified that when she too developed an outbreak of what was almost certainly genital herpes, she demanded that defendant

21

prescribe the same medication for her; that he did so; and that the medication—whatever it was—gave some relief from her symptoms.

Defendant was free to attempt to establish that this testimony was incredible because, for instance, there was *no* treatment at that time fitting the witness's description. Instead he transparently erects a straw man which he then assails with great vigor. We are unmoved by this pantomime jousting. Indeed, given defendant's presumptive access to medical literature and familiarity with the means to research such matters, his failure to present evidence supporting a less specious argument may itself suggest that there *were* in fact other topical treatments for genital herpes prior to the introduction of Zovirax. One such treatment is suggested by the testimony of defendant's second wife, who said that her doctor told her to apply "Betad[i]ne on cotton pads" to the inflammation, which "really cooled it down and made it feel better." Web research suggests other candidates, but of course none of that information is properly before us. On this appeal it is defendant's burden to show that the evidence before the trial court was unworthy of belief. He does not carry that burden.

Defendant also mounts a more general if somewhat oblique attack on the overall proposition that he knew he had genital herpes. But the trial court was entitled to infer that the information in his possession when he met plaintiff would have told any person of ordinary intelligence—and certainly any competent doctor of medicine—that he was carrying HSV-2. Most damning in this regard is the testimony of defendant's second wife, who said that in late 1981 or early 1982—shortly after they were married and perhaps a year after they began having sexual intercourse—she developed an "incredibly painful" inflamed sore on her perineum. She visited her internist, who examined the inflammation and immediately declared it to be genital herpes. She promptly informed defendant of these developments, saying, "You have given me herpes," and "I have genital herpes." Defendant did not deny it, look surprised, suggest any responsive course

of action, or question the origin of the infection. Instead he "looked very thoughtful, and he said well, you know, I have had a nodule on my penis but, you know, it's okay." He appeared to view it as "no big deal, and we'll just carry on." Over the remainder of their time together she had 70 or 80 such outbreaks, at a rate of about once a month. If defendant manifested an interest in intercourse during an active outbreak, she would "say I have a big herpes outbreak, or I have a big herpes sore. I don't want to have sex tonight." Defendant would sometimes honor these objections, but perhaps 20 times he did not. She found sex on those occasions "[e]xtremely painful," but apparently tolerated them because the couple was trying to conceive a child. In February 2012 she took a blood test for HSV-2; the results were positive.

Defendant sought to impeach this testimony by various inferential arguments below, but the trial court manifestly rejected those arguments, and defendant sets forth no colorable ground on which to overturn that determination. Nor was the trial court required to credit his various attempts to depict himself as remarkably innocent of relevant medical knowledge, or his assertions that there was no blood test for genital herpes before 1999. The second point seems to founder on his own admissions, made in the course of cross-examining his second wife, that for some undefined time prior to the blood test it was possible to test for the virus by scraping and culturing a lesion. He further indicated that he, "as a medical trainee," "would have known that." While he apparently hoped this information would somehow impeach the witness, its more forceful tendency is to impeach his own implied contentions. If he knew he had symptoms consistent with genital herpes, and had indeed been accused of infecting one wife with that affliction, why would he himself not insist upon culturing one of the outbreaks to confirm its nature? One rational inference, if not the only one, is that he already knew what the test would tell him, and had no wish to bring a definitive confirmation into his medical record.

23

In any event, the testimony we have cited is more than sufficient to sustain a finding that when defendant told plaintiff he was free of sexually transmitted diseases, and more specifically of herpes, he actually knew those statements were false; that when he proceeded to have unprotected sex with her, he knew he was likely to infect her with genital herpes; and that he thus acted not only fraudulently but with reckless disregard for her rights and for the injuries that were likely to flow from his conduct. The trial court was wholly justified in concluding that his conduct was sufficiently reprehensible to warrant exemplary damages.

### B. Size of Award

Defendant asserts that the punitive damages award is "excessive" because of financial hardships to which it will subject him. Characteristically, most of the factual assertions on which the argument rests are unsupported by citations to the record. He cites a passage in which the trial court alluded to "$750,000 in retirement funds" as an asset contributing to defendant's net worth. Defendant claims that this sum is "non-spendable and should not be included as net worth." We reject this assertion for want of supporting evidence, argument, or authority.

Under an ostensible challenge to the compensatory damage award (see preceding part), defendant cites a British case for the proposition that "[d]raconian punishment for herpes is against public policy." Although he provides only the name of the case, he is apparently referring to *Regina v. Golding (David)* (2014) 2014 WL 1220007. That decision arose from a *criminal prosecution* under the rule of British law that "a person who is suffering from a sexual disease and who has sexual intercourse with a partner, not intending deliberately to infect her, but knowing that she was unaware of his condition, may be guilty of recklessly inflicting grievous bodily harm."[5] (*Id.*, ¶ 67.) Nothing in

_____

[5] One passage of the decision resonates strongly here: "We did not find the evidence of the appellant impressive or credible. In our judgment, he was seeking to minimise every piece of evidence against him, and to put a construction on events at its

24

that case supports the proposition defendant attributes to it. Certainly the court did not hold that the sentence there—14 months in prison—was excessive. (*Id.*, ¶¶ 86 et seq.) On the contrary, the court found that the sentence was appropriate when imposed, but that the defendant had been sufficiently injured by ensuing delays that the sentence should be reduced to time already served. (*Id.*, ¶¶ 93.) That is, the reviewing court did not substitute its own judgment for that of the sentencing court, but held rather that *subsequent circumstances* warranted a reduction of the sentence.

This court has no power to reduce a compensatory damage award based upon its own independent assessment of the facts. The nearest thing to such a power is our duty to independently review an award of punitive damages when the defendant challenges them as "constitutionally excessive" under the federal due process clause. (See *Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1172 (*Simon*), citing *State Farm Mut. Auto. Ins. Co. v. Campbell* (2003) 538 U.S. 408, 418.) Even if we indulge defendant to the point of treating his brief as presenting such a challenge, we see nothing that leads us to overturn the trial court's determination. In reviewing such an award, we are to independently assess "the reprehensibility of the defendant's conduct, the relationship between the award and the harm done to the plaintiff, and the relationship between the award and civil penalties authorized for comparable conduct." (*Simon*, *supra*, at p. 1172.) We remain obligated, however, to exercise "the ordinary measure of appellate deference" to the trial court's "findings of historical fact." (*Ibid.*)

With respect to the first factor, the punitive award here was $398,400. The compensatory damages found by the court totaled $511,000. Defendant has mounted no

---

most favourable to him. His evidence was neither accurate nor truthful on key issues such as his dealings with [the victim] and what occurred on the day when he pleaded guilty. His evidence was at odds with other objective evidence. Where his evidence conflicted with that of [the victim] and [the appellant's solicitor], we have no difficulty in accepting their accounts rather than his." (*Id.* ¶ 45.)

coherent challenge to that finding, which is therefore conclusive on us. Nor does defendant offer any cogent reason to suppose that the punitive award was disproportionate to the harm reflected in the compensatory award. He points to no "civil penalties for comparable conduct." We doubt that an extended demonstration is required to sustain the proposition that a doctor who deliberately infected a *patient* with an ineradicable biological agent would be almost certain to lose his license to practice medicine, and thus his means of livelihood. We cannot say that an award of slightly less than $400,000 is out of proportion to such a penalty.

This brings us to the real crux of the case, which is the degree of reprehensibility of defendant's conduct. We believe the trial court could very reasonably conclude, as indeed we have concluded on such of the record as has been placed before us, that defendant, with full knowledge he was carrying what most people would view as a noxious disease, and without disclosing that fact to anyone, burdened three wives and quite possibly other sexual partners with that affliction. The most charitable construction we can place on his conduct, as found by the trial court upon ample evidence, is that he viewed the disease as insufficiently serious to require its disclosure, even when pointedly asked whether he was carrying it. The staggering hubris of this conduct, and its stark transgression against the norms of any decent and civilized society, amply justified a very substantial award of punitive damages. Short of forcible rape, or intercourse with someone incapable of consent, it is difficult to imagine a greater outrage against the bodily autonomy and sexual sovereignty of another individual than to fraudulently induce them to enter an intimate relationship with the knowledge that doing so will expose them to likely infection. In plaintiff's case, defendant's conduct inflicted what threatens to be a lasting impairment of her ability and willingness to enter into intimate relationships with anyone else. His seemingly total lack of empathy for his victims, his repellent attempts to imply that they bear responsibility for their injuries, and his manifest lack of remorse

26

for his ethically indefensible and morally corrupt conduct, further justify the award. If there is a reason to overturn or reduce the award, it has not been brought to our attention and has not otherwise surfaced in our review of the case.

## XVII.  Remaining Contentions

Defendant offers two more contentions concerning conduct of a retrial. Since we are affirming the judgment, these contentions are moot.

### DISPOSITION

The judgment is affirmed.

27

_____
RUSHING, P.J.

WE CONCUR:


_____
ELIA, J.


_____
WALSH, J.[*]

---

[*] Judge of the Santa Clara County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

28