Filed 4/24/20

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JUSTIN MOORE,<br><br>    Plaintiff and Respondent,<br>v.<br><br>RICHARD BURDEN TEED,<br><br>    Defendant and Appellant. | A153523<br><br>(San Francisco County<br>Super. Ct. No. CGC-13-533313) |

This lawsuit arises out of the purchase and botched remodel of a fixer-upper house in the Pacific Heights neighborhood of San Francisco. Plaintiff Justin Moore alleges he was fraudulently induced by his real estate agent Richard Burden Teed to purchase and renovate the property based on Teed's assurances that he and his team of experienced contractors could deliver a set of high-end improvements for only $900,000. Moore sued after the installed foundation proved defective and the promised renovations were far more costly than what Teed had represented they would be. The jury returned a verdict in favor of Moore on his tort claims and awarded him his out-of-pocket expenses for replacing the foundation and benefit-of-the-bargain damages for the additional cost he incurred in obtaining the renovations that had been promised to him.

Conceding liability, Teed challenges the award of benefit-of-the-bargain damages and statutory attorney fees on various grounds. Courts of Appeal are divided over the question whether benefit-of-the-bargain damages may be recovered in fraud claims involving real property transactions where the

1

fraud is perpetrated by a fiduciary. We are persuaded by those authorities which have concluded that benefit-of-the-bargain damages are available to fully compensate a plaintiff for all the detriment proximately caused by a fraudulent fiduciary's actions. We also conclude that the jury properly awarded statutory attorney fees and costs. Accordingly, we affirm the judgment below.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

### A. *Background*

Moore decided to buy a house in San Francisco but found he could not afford one in the neighborhoods he preferred. In 2011, Moore met Teed, who promoted himself on the Internet as a real estate agent with "over 25 years of experience as a building contractor" with "an extensive background in historic restorations" and "a deep understanding of quality construction." Teed told Moore that he could locate a lower-priced fixer-upper home in a choice neighborhood and then renovate it in a cost-effective manner. Based on his interactions with Teed and his exposure to Teed's promotional materials, Moore believed that Teed was a general contractor. Both Moore and Moore's father toured several examples of homes that Teed had renovated and were impressed with Teed's substantial knowledge of materials and design and his business affiliations. Moore retained Teed as his real estate agent.

In May 2011, following Teed's advice, Moore bought a large fixer-upper house on Green Street for $4.8 million. The home was built in 1912 and was last updated in the 1950s. Moore borrowed significantly from his father and a bank to purchase the house. Teed received a commission from the sale.

---

[1] Under established appellate principles, we recite the facts in the light most favorable to the judgment below. (*People v. Bogle* (1995) 41 Cal.App.4th 770, 775.)

Before the close of escrow, Teed proposed renovating the basement to create a "below-ground floor Grade A living space" with a cinema and a wine cellar. Teed said other rooms in the house could also be expanded and modernized. Moore's father had a lengthy conversation with Teed in which they discussed on a line-by-line basis what the costs of construction would be for a specific list of improvements. Based on these conversations, Moore expected that in exchange for the $4.8 million purchase price plus $900,000 for renovations (excluding certain design fees), Teed and his team of construction professionals would deliver the Green Street home renovated to the same high-end standard as the other projects Teed had shown Moore.

Teed recommended that Moore hire architect Gregg De Meza to design the renovations. De Meza and Teed met with Moore and Moore's father to outline the budget for various aspects of the project. The projected budget for the foundation work, for example, was $200,000. After the close of escrow, De Meza prepared a 10-page comprehensive "Creative Spec" setting forth the proposed renovations in detail.

De Meza put the project out for bidding and received contractor bids ranging from approximately $1.6 million to $2.4 million. Teed told Moore that he would work with De Meza to get the project back within the budget. Teed proposed cutting costs for some items as well as performing demolition in the upper floors and completing the foundation and basement work before seeking further bids. Moore and his father agreed to Teed's plan of action.

Moore employed Teed's associates for the project. He signed contracts with two engineering firms recommended by Teed. Moore did not sign a written contract with Teed himself because Teed stated he "didn't need contracts; that this is what he did. This is how he built his reputation." Moore nevertheless believed that he had an oral agreement with Teed. Work

3

demands prevented Moore from visiting the site regularly and he relied on progress videos sent by Teed. Teed set up a joint account funded by Moore to make payments to the contractors.

Teed was not in fact a licensed contractor. Beginning in 2011, Teed's team of contractors gutted large parts of the house, excavated the lot, and built most of the foundation meant to house the basement-level living space. The foundation was defective, however, because it lacked any waterproofing despite the property's high water table. After Moore became aware of the defects, he halted all work on the project and terminated De Meza. Moore's father engaged consultants to evaluate and report on the foundation. They concluded, despite strong resistance from Teed, that the foundation had to be torn out and replaced. Teed's structural engineer agreed that the foundation was defective and privately apologized to Moore. By then, Moore had paid about $265,000 of the $900,000 promised cost for Teed's renovations.

## B.    *Litigation Commences*

On August 2, 2013, Moore filed a complaint against Teed and other defendants for breach of contract, intentional misrepresentation, negligent misrepresentation, negligence, breach of fiduciary duties, negligence per se, violation of Business and Professions Code[2] section 17200, professional negligence, and recovery against license bonds. Moore alleged he was fraudulently induced to purchase and renovate the property based on false representations that Teed was an experienced contractor who could deliver a basic, yet quality remodel for $900,000.

Moore hired a new architect and a general contractor  The defective foundation was demolished and replaced and renovations along the lines of

---

[2] All further statutory references are to the Business and Professions Code except as otherwise indicated.

those promised by Teed were completed at a much higher expense. Moore and his father eventually expanded the renovation well beyond what Teed had originally proposed. Moore did not seek damages for these additions at trial. By the 2017 trial, Moore had nearly completed the renovations to his home at a total cost of about $9 million.

At trial, construction cost estimator Christine Kiesling testified for Moore as an expert witness. Kiesling explained that the cost to complete Teed's proposed renovations was much higher than promised because Teed's estimates had been unrealistically low and because construction expenses had gone up in the additional time it took to tear out and replace the foundation. Kiesling testified about four items of damages claimed by Moore: (1) the difference in value between the actual cost of Teed's renovations using 2011-2012 pricing rates and the promised cost of $900,000; (2) the actual cost to demolish and replace the foundation; (3) the value of the lost use of the property; and (4) the increased costs due to the delay in the renovations.

Kiesling estimated the De Meza design would have cost $4,477,249 to build in 2011-2012. The foundation alone should have been priced at $620,000, not $200,000. Kiesling's estimate was over $1 million above the highest contractor bid De Meza received in 2011. She explained that her estimate was higher because the 2011 bids contained many significant omissions, including the cost of materials, installation, and installing a fire sprinkler system.

In closing arguments, Moore's counsel told the jury: "The first category of damage that Mr. Moore is entitled to from Mr. Teed is the difference between the renovation's promised cost—that's the $900,000 for the construction—and the cost calculated to do that work in 2011-2012." Counsel asked for an award of $3,842,160 for this category of damages. She also

requested $693,000 for increased costs due to the delay in the renovation work.

Teed's counsel argued there had never been a promised $900,000 remodel and urged the jury to award nothing for the first and last categories of damages. He said the alleged damages did "not represent any loss that was actually sustained by the plaintiff in the real world. [¶] What it really is, is free money that is fabricated out of thin air, and we don't think that you should award any."

## C. *Jury Verdict and Posttrial Matters*

The jury found for Teed on Moore's claim for breach of contract but found in favor of Moore on all of his remaining tort claims.[3] It awarded benefit-of-the-bargain damages of $900,000 for the difference between the renovation's promised cost and the actual cost to do the same work using 2011-2012 rates, and $104,498 in increased costs due to delay. The jury also awarded Moore out-of-pocket damages of $822,904 for the actual cost to replace the foundation, and $106,920 for lost use of the property—damages that Teed does not challenge on appeal. The damages awarded against Teed totaled $1,934,322.

The trial court granted Teed's motion for an offset based on Moore's settlements with other defendants, leaving the net damages against Teed at $934,322. The court also granted Moore's motion for statutory attorney fees and costs based on the jury's special verdict finding that Teed had violated section 7160 of the Contractors' State License Law (§ 7000 et seq.). Moore was awarded $2,114,434 in attorney fees plus $104,498 in costs under Code of Civil Procedure section 1032. The trial court denied Teed's motion for a new trial and entered an amended judgment. This appeal followed.

---

[3] The trial court later ruled against Moore on his section 17200 claim.

6

**DISCUSSION**

We review Teed's claims that the trial court erroneously instructed the jury on matters of law de novo, viewing the evidence in the light most favorable to the claim of instructional error. (*Mize-Kurzman v. Marin Community College Dist.* (2012) 202 Cal.App.4th 832, 845–846.) "In other words, we assume the jury might have believed the evidence favorable to the [prevailing party] and rendered a verdict in [the prevailing party's] favor on those issues as to which it was misdirected." (*Id.* at p. 846.) Teed's claim that attorney fees were awarded under a misapplication of law is a legal question we review de novo. (*Employers Mutual Casualty Co. v. Philadelphia Indemnity Ins. Co.* (2008) 169 Cal.App.4th 340, 347.)

## I. *Damages Award*

Teed challenges the damages award on several grounds. He claims that benefit-of-the-bargain damages cannot be awarded alongside out-of-pocket damages as a matter of law, benefit-of-the-bargain damages are not a permissible form of recovery for fraud actions involving the purchase of real property, and the trial court erred in allowing a damages award founded on speculative assumptions about a hypothetical project that was never built. These errors were compounded, Teed argues, when the trial court permitted double recovery for the cost of replacing the foundation. We find no merit to any of these contentions.

### a. *The Trial Court Did Not Err in Instructing on Alternative Forms of Recovery*

The principles applicable to a damages award for fraud are well settled. "There are two measures of damages for fraud: out-of-pocket and benefit of the bargain. [Citation.] The 'out-of-pocket' measure of damages 'is directed to restoring the plaintiff to the financial position enjoyed by him prior to the fraudulent transaction, and thus awards the difference in actual value at the

time of the transaction between what the plaintiff gave and what he received. The 'benefit-of-the-bargain' measure, on the other hand, is concerned with satisfying the expectancy interest of the defrauded plaintiff by putting him in the position he would have enjoyed if the false representation relied upon had been true; it awards the difference in value between what the plaintiff actually received and what he was fraudulently led to believe he would receive.' " (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1240 (*Alliance Mortgage*); see *Lazar v. Superior Court* (1996) 12 Cal.4th 631, 646 (*Lazar*) ["Because of the extra measure of blameworthiness inherent in fraud, and because in fraud cases we are not concerned about the need for 'predictability about the cost of contractual relationships' [citation], fraud plaintiffs may recover 'out-of-pocket' damages in addition to benefit-of-the-bargain damages."].)

As described above, Moore was awarded $900,000 in benefit-of-the-bargain damages based on the difference between the price Teed represented the renovations would cost and the actual cost to do the same renovations using rates from 2011-2012. Moore was also awarded out-of-pocket damages for costs he incurred to tear out and replace the defective foundation. We analyze these separate items of recovery in further detail below. Here, we address Teed's contention that benefit-of-the-bargain and out-of-pocket damages cannot both be awarded on a tort claim. Teed's reliance on a footnote in *Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1176, footnote 4 (*Simon*)) is misplaced.

In *Simon*, the Supreme Court concluded that a punitive damages award was excessive under federal constitutional principles. (*Simon, supra,* 35 Cal.4th at p. 1167.) The plaintiff in the underlying action prevailed on a claim of promissory fraud against the seller of a commercial office building

8

who backed out of the real estate transaction. The jury found that although the parties had no enforceable agreement, the plaintiff was entitled to $5,000 in compensatory damages and $1.7 million in punitive damages. (*Id.* at pp. 1170–1171.) In reversing the punitive damages award, the *Simon* court rejected the plaintiff's claim that the defendant's fraudulent promises caused him $400,000 in potential losses—the profit plaintiff might have earned had the transaction been consummated. (*Id.* at pp. 1173–1175.) The *Simon* court concluded that the plaintiff was not entitled to lost profits of $400,000 because the defendant's fraud was not the cause of plaintiff's failure to obtain the property. (*Id.* at p. 1176.)

Teed contends that *Simon* forecloses a tort plaintiff's right to recover both benefit-of-the-bargain and out-of-pocket damages in cases where, "[l]ike the *Simon* plaintiff, Moore prevailed on his fraud claim but not on his contract claim." He quotes footnote 4 of the *Simon* opinion, which responded to the *Simon* plaintiff's argument that under *Lazar*, *supra*, 12 Cal.4th 631, a fraud plaintiff generally may recover both benefit-of-bargain and out-of-pocket damages. "[Plaintiff's] reliance is misplaced: our reference in [the *Lazar*] decision to benefit-of-bargain damages was to their recovery under a *contract* cause of action." Teed, however, omits the last sentence of the footnote, which states: "On a different point, nothing we say in this case affects the scope of damages recoverable for fraud committed by a fiduciary." (*Simon, supra,* 35 Cal.4th at p. 1176, fn. 4.)

We need not resolve whether Teed's interpretation of *Simon* is correct because it is clear that *Simon* does not purport to address the availability of benefit-of-the-bargain damages when tort victims have been defrauded by their fiduciaries—exactly the situation presented by the instant appeal. As we explain below, *Alliance Mortgage* and other authorities have recognized

9

that where the defrauding party stands in a fiduciary relationship with the victim of fraud, a "broader" measure of damages may be awarded than simply "out-of-pocket" losses. (*Alliance Mortgage*, *supra*, 10 Cal.4th at pp. 1240–1241.) Accordingly, the trial court committed no error in instructing the jury on alternative forms of recovery.

### b. *Benefit-of-the-Bargain Damages May Be Awarded for Fraud Committed by a Fiduciary in Real Property Transactions*

Teed next contends that benefit-of-the-bargain damages are never recoverable for fraud claims involving real property transactions, even when the fraud is perpetrated by a fiduciary. While there is a split of authority on this question, we are persuaded by the majority of courts which have concluded that benefit-of-the-bargain damages are recoverable in fraud actions where a fiduciary induces an individual to purchase, sell, or exchange real property to their detriment.

As a general matter, in fraud claims involving the purchase, sale or exchange of property, the Legislature has directed that the "out-of-pocket" rather than the "benefit-of-the-bargain" measure of damages should apply. Civil Code section 3343, subdivision (a), provides, "One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction," including certain enumerated damages such as lost profits. Our high court has clarified that "[t]his section does *not* apply, however, when a victim is defrauded by its fiduciaries. In this situation, the 'broader' measure of damages provided by [Civil Code] sections 1709 and 3333 applies." (*Alliance Mortgage, supra,* 10 Cal.4th at p. 1241, italics added.)

10

Under Civil Code section 1709, a defendant who willfully deceives a plaintiff with the intent to induce him to alter his position to his detriment "is liable for any damage which he thereby suffers." Civil Code section 3333, the general tort damage measure, provides that the "measure of damages . . . is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." As one leading treatise has noted, these two statutes support imposing benefit-of-the-bargain damages in real property transactions involving a fraudulent fiduciary " 'because a fiduciary should be responsible to compensate his or her principal for the full amount of the loss caused by his or her breach of duty.' " (See *Fragale v. Faulkner* (2003) 110 Cal.App.4th 229, 238–239 (*Fragale*), quoting 2 Miller & Starr, Cal. Real Estate (3d ed. 2000) § 3.33, pp. 190–191, fns. omitted.)

In *Salahutdin v. Valley of California, Inc.* (1994) 24 Cal.App.4th 555, our colleagues in Division Two affirmed an award of benefit-of-the-bargain damages against a fiduciary in a real estate fraud action. The court concluded that benefit-of-the-bargain damages was an appropriate remedy under Civil Code sections 1709 and 3333 based on the " ' "determination that *the faithless fiduciary shall make good the full amount of the loss of which his breach of faith is a cause.*" ' " (*Salahutdin,* at p. 567; see *Pepitone v. Russo* (1976) 64 Cal.App.3d 685, 689 (*Pepitone*) [holding that "the measure of damages provided by [Civil Code sections 1709 and 3333] is substantially the same as that for breach of contract prescribed by [Civil Code] section 3300; i.e., it tends to give the injured party the *benefit of his bargain and insofar as possible to place him in the same position he would have been had the promisor performed the contract.*"].)

Contrary to Teed's assertion on appeal, *Alliance Mortgage* did not disapprove *Salahutdin.* The question before the high court was whether a real estate lender's full credit bid at a nonjudicial foreclosure sale barred the lender from pursuing a separate fraud action against third party fiduciaries that induced the lender to make the loans. (*Alliance Mortgage, supra,* 10 Cal.4th at pp. 1241–1242.) After noting *Salahutdin*'s holding that benefit-of-the-bargain damages are available in claims of fraud by a fiduciary, the court cautioned that *Salahutdin* involved claims of a fiduciary's *negligent* misrepresentation, and in such circumstances "a plaintiff is only entitled to its actual or 'out-of-pocket' losses suffered because of fiduciary's negligent misrepresentation under [Civil Code] section 3333." (*Alliance Mortgage*, at pp. 1249–1250.) As to a "fiduciary's *intentional* misrepresentation" however, the court recognized that "the measure of damages under section 3333 might be greater" but left the issue for another day. (*Id*. at p. 1250.) Far from disapproving *Salahutdin*, the Supreme Court reaffirmed the lower court's reasoning that fraudulent fiduciaries may be subject to a "broader" measure of damages under Civil Code sections 1709 and 3333. (*Alliance Mortgage*, at p. 1241.)

*Alliance Mortgage* left unresolved the split of authority concerning the appropriate measure of damages for a fiduciary's intentional fraud, and the disagreement persists. In *Fragale,* the Second Appellate District concluded that benefit-of-the-bargain damages apply in intentional fraud claims involving a fiduciary, observing that " 'the remedy afforded by [Civil Code] sections 1709 and 3333 aims at compensation for any and all the detriment proximately caused by the breach.' " (*Fragale, supra,* 110 Cal.App.4th at p. 238.) "The benefit-of-the-bargain measure places a defrauded plaintiff in the position he would have enjoyed had the false representation been true,

12

awarding him the difference in value between what he actually received and what he was fraudulently led to believe he would receive." (*Id.* at p. 236.) In *Strebel v. Brenlar Investments, Inc.* (2006) 135 Cal.App.4th 740, Division Three of this court concluded that a real estate broker's fraudulent concealment of facts that induced his client to sell his house prematurely allowed for an unusual damages award—the loss in appreciation of his home caused by the premature sale. (*Id.* at pp. 744–745.) The court reasoned that " '[t]here is no fixed rule for the measure of tort damages under Civil Code section 3333' " and " '[t]he measure that most appropriately compensates the injured party for the loss sustained should be adopted.' " (*Strebel*, at p. 749.)

Conversely, in *Hensley v. McSweeney* (2001) 90 Cal.App.4th 1081, the Fifth Appellate District limited the damages available for claims of fraud by a fiduciary in a real property transaction to out-of-pocket damages. (*Id.* at p. 1086.) It adopted the reasoning of its earlier decision in *Overgaard v. Johnson* (1977) 68 Cal.App.3d 821, which held that the measure of damages for fraud by a fiduciary is out-of-pocket damages, not the benefit-of-the-bargain damages normally applicable to contract causes of action. (*Overgaard,* at pp. 826–828.) But *Overgaard* involved allegations of negligent misrepresentation by a fiduciary, and *Hensley* does not explain why the same out-of-pocket rule should apply for a fiduciary's intentional fraud.

We are persuaded by the reasoning of *Pepitone, Salahutdin, Fragale*, and related authorities and conclude that where a person has been defrauded by their fiduciary in a real property transaction, the measure of damages available under Civil Code sections 3333 and 1709 may include a benefit-of-the-bargain damages award. Applying this broader measure of damages ensures that a faithless fiduciary is held to account for the full amount of the loss of which his breach of faith is a cause (*Pepitone*, *supra*, 64 Cal.App.3rd at

13

p. 688), and that a victim is compensated for any and all detriment proximately caused by their fraudulent behavior.  (Civ. Code, § 3333.)[4]

### c.  *The Damages Award Was Not Speculative*

Teed next argues that the jury could not have calculated a benefit-of-the-bargain damages award because such damages require that both the scope of promised work and the actual value received (i.e., the actual cost to accomplish the renovations) be definite and concrete.  Moore's damages were too speculative because the project that Teed said would cost $900,000 was never built as the construction plans "were in a constant state of change" due to extensive revisions Moore made to the plans over time.  Teed also claims the actual cost to perform the work rested on conjecture because the project as contemplated during Teed's involvement was never built.  The hypothetical costs due to delay must fall away for the same reasons.  We are not persuaded that the evidentiary record is too indefinite to support the damages award or that the jury was erroneously instructed in the calculation of such damages.

"Whatever its measure in a given case, it is fundamental that 'damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery.  [Citations.]'  [Citations.]  However, recovery is allowed if claimed benefits are reasonably certain to have been realized but for the wrongful act of the opposing party."  (*Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 989.)

As a preliminary matter, Teed's argument that the scope of the promised renovations was too indefinite to support the damages award

---

[4] We reject Teed's related argument that benefit-of-the-bargain damages may not be awarded in the absence of an enforceable contract.   As discussed above, such damages are available in tort cases involving fraud committed by a fiduciary in real property transactions.

14

stands in tension with his concession on liability.  We must accept all facts in support of his liability for fraud, including that he held himself out as an experienced contractor and renovator of houses and that he falsely represented to Moore that he and his team could deliver a set of specific renovations for only $900,000.  The record evinces that Teed's conversations with Moore and Moore's father generated a sufficiently clear scope of work for the promised renovations prior to the close of escrow.  In one such conversation, Teed and Moore's father discussed on a line-by-line basis what the cost of construction would be for a list of renovations, with the costs totaling $900,000.  That the renovation concepts were modified in follow-up conversations with Teed and architect De Meza does not render this evidence remote or illusory.

We must also reject Teed's claim that there was no evidence the promised renovations were ever completed.  As the trial court found in denying Teed's motion for new trial:  "[T]he most relevant misrepresentations are Teed's statements that the value of his team's renovation—the 'Teed/De Meza project'—would be $900,000.  Eventually, *Moore actually received that renovation, but at far greater cost* than the $900,000 Teed fraudulently led Moore to believe when convincing him to buy the house and undertake the renovation.  The damage was not speculative; it was supported by documents and by testimony from Moore, his father, Teed himself and Christine Kiesling, a well-qualified expert on construction costs."  (Italics added, fns. omitted.)  While some plans were changed and the actual renovation was more expansive than Teed's proposal, it is undisputed that Moore did not seek to recover damages for work that went beyond what Teed had promised to deliver.

15

Teed also challenges Kiesling's estimate of the cost to build the Teed/De Meza renovations in 2011-2012, noting that Kiesling did not rely on the actual cost to complete the project. That comes as no surprise, however, because the renovations were delayed by a defective foundation that first had to be replaced. To the extent Teed is arguing that a construction expert cannot recreate the cost of building such a project under 2011-2012 rates, no evidence supports it. The parties' testimony as well as Kiesling's testimony established the projected costs to a reasonable certainty. Her estimate was based on floor plans and specifications that were directly tied to Teed's original $900,000 proposal. Kiesling also gave specific testimony on the increased costs associated with delaying the renovations. On this record, we cannot say the jury's decision to award Moore the difference between the promised cost and the actual cost he would have spent to renovate the Green Street home per Teed's recommendations is entirely speculative as a matter of law.

Teed further complains that the trial court erroneously modified the standard CACI instruction on benefit-of-the-bargain damages. CACI No. 1924 provides: "To determine the amount of damages, you must: [¶] 1. Determine the fair market value that [name of plaintiff] would have received if the representations made by [name of defendant] had been true; and [¶] 2. Subtract the fair market value of what [he/she/it] did receive. [¶] The resulting amount is [name of plaintiff]'s damages." CACI No. 1924 was modified by the trial court to read: "To determine the amount of damages, you must determine: [¶] 1. The difference between the actual cost that Mr. Moore would have incurred in 2011 and 2012 to complete the work promised by Mr. Teed and the amount for which Mr. Teed promised to complete the work; [¶] And [¶] 2. Increased costs due to the delay.

16

Citing out-of-state authorities, Teed argues that benefit-of-the-bargain damages cannot be awarded when they are based on the value of something nonexistent and never in fact received. He quotes *Barrows v. Forest Laboratories, Inc.* (2d Cir. 1984) 742 F.2d 54, 60) for the proposition that " '[a] claim for benefit-of-the-bargain damages must be based on the bargain that was actually struck, not on a bargain whose terms must be supplied by hypotheses about what the parties would have done if the circumstances surrounding their transaction had been different.' " Teed contends that the difference between the promised cost of his vague, original renovation concepts and the hypothetical cost of De Meza's later, more elaborate design—neither of which was ever built—has no connection to any damages that Moore actually suffered.

Teed's jury instruction challenge is but a variation on his assertion that the damages were speculative. For the reasons explained, the record supports the conclusion that benefit-of-the-bargain damages here were ascertainable with relative certainty based on expert and party testimony about a specific set of promised renovations and the actual cost to complete those renovations. We thus find these authorities inapt.

Even if Teed were correct that the challenged damages were improper under a benefit-of-the-bargain theory, we conclude that the jury would have returned the same damages award under Civil Code sections 1709 and 3333.[5]

---

[5] The jury was instructed under CACI Nos. 3900 and 1923 that the amount of damages to reasonably compensate Moore "must include an award for each item of harm that was caused by Mr. Teed's wrongful conduct, even if the particular harm could not have been anticipated," and that Moore was entitled to recover "amounts that he reasonably spent in reliance on Mr. Teed's false representations even if those amounts would not otherwise have been spent."

"Tort damages are awarded to fully compensate the victim for all the injury suffered. [Citation.] There is no fixed rule for the measure of tort damages under Civil Code section 3333. The measure that most appropriately compensates the injured party for the loss sustained should be adopted." (*Santa Barbara Pistachio Ranch v. Chowchilla Water Dist.* (2001) 88 Cal.App.4th 439, 446–447; accord, *Erlich v. Menezes* (1999) 21 Cal.4th 543, 550.)

The jury found that the only way to fully compensate Moore for the detriment caused by Teed's misrepresentations that he and his team of experienced contractors could deliver a quality remodel for only $900,000 was to award Moore the additional cost necessary to accomplish the promised renovations. Once Moore was induced to buy the house and hire people to renovate it in reliance upon Teed's false representations, he was entitled under Civil Code section 3333 to be compensated "for all the detriment proximately caused thereby," including the increased expense attributable to the delay resulting from the need to demolish and remove the defective foundation. We will not disturb the jury's verdict in the absence of a clear miscarriage of justice. (Cal. Const., art. VI, § 13; *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 573–580.)

### d. The Damages Award Was Not Duplicative

Teed finally asserts that the benefit-of-the-bargain damages award was improper because it duplicates the out-of-pocket damages that the jury awarded for the foundation replacement. While it is true that "[d]ouble or duplicative recovery for the same items of damage amounts to overcompensation and is therefore prohibited" (*Tavaglione v. Billings* (1993) 4 Cal.4th 1150, 1159), Teed is barred from claiming that the jury awarded overlapping damages because he did not request a special verdict form

18

containing separate entries for each component of damages comprising the benefit-of-the-bargain damages award.

"To preserve for appeal a challenge to separate components of a plaintiff's damage award, a defendant must request a special verdict form that segregates the elements of damages. [Citations.] The reason for this rule is simple. Without a special verdict separating the various damage components, 'we have no way of determining what portion—if any' of an award was attributable to a particular category of damages challenged on appeal." (*Greer v. Buzgheia* (2006) 141 Cal.App.4th 1150, 1158.)

Because we cannot determine from the record whether the jury awarded damages for the defective foundation as part of its $900,000 benefit-of-the-bargain award, Teed has forfeited his claim on appeal. As Moore points out, the jury returned a verdict for benefit-of-the-bargain damages that was substantially below the requested amount of $3,842,160, and it awarded Moore the exact amount ($822,904) he had requested for the cost of replacing the foundation. This would suggest that the jury separated the damages award for the foundation replacement from benefit-of-the-bargain damages items for completing the promised renovations. There is no basis for inferring that the benefit-of-the-bargain damages award contains any duplicate money for foundation replacement.

## II.    *Attorney Fee Award*

Teed challenges the trial court's award of attorney fees under section 7160, contending the statute does not apply to him and the court's jury instructions were misleading and led to an inconsistent verdict. He seeks reversal of the entire attorney fee award. We will affirm.

Section 7160, part of the Contractors' State License Law, provides as follows: "Any person who is induced to contract for a work of improvement,

19

including but not limited to a home improvement, in reliance on false or fraudulent representations or false statements knowingly made, may sue and recover from such contractor or solicitor a penalty of five hundred dollars ($500), plus reasonable attorney's fees, in addition to any damages sustained by him by reason of such statements or representations made by the contractor or solicitor."

At trial, the parties agreed to an instruction that closely tracked section 7160 but, for reasons appellate counsel could not explain, omitted the word "solicitor." The CACI No. 418 instruction given to the jury stated in part: "Business & Professions Code section 7160 states: 'Any person who is induced *to contract* for a work of improvement, including by [*sic*] not limited to a home improvement, in reliance on false or fraudulent representations or false statements knowingly made, may sue and recover *from such contractor*.'" (Italics added.) In response to question 9 on the verdict form, "Did Justin Moore prove that Richard Teed violated Business & Professions Code § 7160 (see CACI [No.] 418)?," the jury answered "Yes."

While Teed concedes that a contract is not required for a person to be deemed a "contractor" under the Contractors' State License Law, he contends that a contract was required here in order for the jury to have found him in violation of section 7160 because CACI No. 418 describes a person "who is *induced to contract* . . . recover[ing] *from such contractor*." Because the jury found that no contract existed between Moore and Teed when Teed prevailed on the breach of contract claim, that finding renders the jury's verdict on section 7160 internally inconsistent and unsustainable. Moore counters that we should not infer that the jury found there was no enforceable agreement between Moore and Teed simply because it found against Moore on that cause of action. He also argues that an attorney fee award under section

20

7160 does not require a contract between Moore and Teed because Teed induced Moore to enter into contracts with his associates. We need not resolve whether a contract was formed between Teed and Moore because we agree that section 7160 permits an attorney fee award against a defendant who fraudulently induces a person to enter into home improvement contracts with his confederates.

We begin with the observation that statutory provisions regulating contractors are to be broadly construed. "The Contractors' State License Law . . . is to be given a 'reasonable and practical construction' '[i]n light of the intent of the Legislature and the purpose behind the statutory scheme—to protect consumers and the public from dishonest or incompetent contractors.' " (*ACCO Engineered Systems, Inc. v. Contractors' State License Bd.* (2018) 30 Cal.App.5th 80, 88.) "California's strict contractor licensing law reflects a strong public policy in favor of protecting the public against unscrupulous and/or incompetent contracting work." (*Vallejo Development Co. v. Beck Development Co.* (1994) 24 Cal.App.4th 929, 938; see *Judicial Council of California v. Jacobs Facilities, Inc.* (2015) 239 Cal.App.4th 882, 894.)

Section 7160 does not exempt noncontracting parties from liability for attorney fees for fraudulent inducement of a home improvement contract. As quoted above, a person may recover damages and attorney fees against one who "solicits" a contract under false pretenses. Teed nevertheless maintains that because "solicitor" was omitted from the given instructions, the jury could only apply the section 7160 attorney fee provision to one who "contracted" with the defrauded victim. We decline to apply such a narrow interpretation to section 7160 and conclude there is an adequate statutory basis for affirming the jury's attorney fee award.

21

Even if we were guided by the CACI No. 418 instruction alone, we would conclude that the instruction permitted the jury to find Teed liable for attorney fees for fraudulently inducing Moore to contract with his team of engineers on a home improvement contract. There is no dispute that Moore was "induced to contract" with Moore's recommended engineers, and that Moore did so in reliance on Teed's fraudulent representations. The only question is whether Moore may recover from "such contractor"—from Teed himself.

To assist the jury, the trial court also instructed on the definition of "contractor" under section 7026, shortening the lengthy statute[6] as follows: " 'Contractor' is synonymous with 'builder.' It is *any person who undertakes to or offers to undertake to, or purports to have the capacity to undertake to*, or submits a bid to, or does himself or herself *or [by or] through others*,

_____

[6] In full, section 7026 states: " 'Contractor,' for the purposes of this chapter, is synonymous with 'builder' and, within the meaning of this chapter, a contractor is any person who undertakes to or offers to undertake to, or purports to have the capacity to undertake to, or submits a bid to, or does himself or herself or by or through others, construct, alter, repair, add to, subtract from, improve, move, wreck or demolish any building, highway, road, parking facility, railroad, excavation or other structure, project, development or improvement, or to do any part thereof, including the erection of scaffolding or other structures or works in connection therewith, or the cleaning of grounds or structures in connection therewith, or the preparation and removal of roadway construction zones, lane closures, flagging, or traffic diversions, or the installation, repair, maintenance, or calibration of monitoring equipment for underground storage tanks, and whether or not the performance of work herein described involves the addition to, or fabrication into, any structure, project, development or improvement herein described of any material or article of merchandise. 'Contractor' includes subcontractor and specialty contractor. 'Roadway' includes, but is not limited to, public or city streets, highways, or any public conveyance." The provision, while wordy, conveys the Legislature's intent to define a large group of actors in the construction field as "contractors" so as to subject them to the Contractors' State License Law.

22

construct, alter, repair, add to, subtract from, improve, [move], wreck or demolish any building, excavation or other structures or works in connection therewith, or the cleaning of grounds and structures in connection therewith, or whether or not the performance of the work herein described involves the addition to, or fabrication into, any structure, project, development or improvement herein described of any material or article of merchandise. 'Contractor' includes subcontractor and specialty contractor."  (Italics added.)

There was ample evidence for the jury to find that Teed was a "contractor" within the meaning of section 7026.  Teed offered to undertake, and purported to have the capacity to undertake, renovations to the Green Street home by or through others—his team of experienced architects, contractors, and engineers.  He led Moore to believe that with his "extensive background" in renovations and "deep understanding of quality construction," he could accomplish quality, cost-effective renovations.  The jury finding that Teed was a contractor thus supported its finding that Teed was in violation of section 7160 and liable for attorney fees.  No inconsistency exists between the jury's finding of liability under section 7160 and its separate finding that Moore failed to meet his burden of proving his breach of contract claim.

Teed attacks the definitional instruction of "contractor" as confusing and incomprehensible, yet he submitted a nearly identical instruction defining "contractor" as his Special Jury Instruction No. 1.  And while he admits he had no objection to the wording of CACI No. 418,  Teed asserts the trial court should have clarified the accompanying instruction defining "contractor" by giving his proposed Special Jury Instruction No. 2, entitled, "Construction managers are not required to be licensed under California law."  The trial court did not err in rejecting Teed's proposed definition of "contractor."

23

"In general, '[i]nstructions in the language of a statute should only be given " 'if the jury would have no difficulty in understanding the statute without guidance from the court.' " [Citations.]' [Citation.] Although instructions based on code sections should follow the language of the particular section at issue, the court should give explanatory instructions where the statutory wording is confusing or couched in legal terms. [Citation.] 'It is incumbent upon the trial court to determine whether or not a code section should be explained.' " (*Brown v. Smith* (1997) 55 Cal.App.4th 767, 784–785.)

The trial court's instruction on the statutory definition of "contractor" required no clarification. While section 7026 is not the most succinct example of statutory drafting, it does not contain any unfamiliar legal or technical terms. Moreover, the court's instruction tailored the statute to conform to the circumstances of this case, omitting unnecessary language that would have distracted from the jury's task.

In contrast, Teed's proposed Special Jury Instruction No. 2 was lengthier than the instruction given by the trial court, included several numbered subparts, and contained argumentative passages. For example, the proposed instruction stated that "even if" Teed engaged in four types of activities, including coordinating construction workers, keeping Moore informed of the project's status, being the onsite "point person," and acting as Moore's agent in the renovations, these activities were not enough to have made him a contractor. The instruction also erroneously stated: "If you find that evidence was presented establishes [*sic*] that [Teed] had no responsibility or authority to perform any construction work on the project, or to enter into any contract or subcontract for the performance of such work, then you must find that he was not acting as a 'contractor.' " This passage

24

misstates the law, as it omits that one can be deemed a contractor under California law if he or she "offers to undertake" or "purports to have the capacity to undertake" or undertakes a renovation "by or through others." (§ 7026.)  In sum, the trial court did not err in awarding Moore his attorney fees under section 7160.

### III.   *Moore's Request for Appellate Fees*

Moore asks that we direct the trial court to award attorney fees incurred on appeal under section 7160.  "A statute providing for an attorney fee award to the prevailing party in litigation ordinarily also authorizes an award of fees incurred on appeal even if it does not expressly so state." " (*Garcia v. Bellflower Unified School Dist. Governing Bd.* (2013) 220 Cal.App.4th 1058, 1067.)  Moore is the prevailing party on appeal, and thus he is entitled to fees under section 7160.  "Although this court has the power to fix attorney fees on appeal, the better practice is to have the trial court determine such fees . . . ." (*Security Pacific National Bank v. Adamo* (1983) 142 Cal.App.3d 492, 498.)

### DISPOSITION

The judgment is affirmed.  The matter is remanded to the trial court for its determination of an award to Moore of attorney fees on appeal.  Moore is entitled to costs on appeal.

_____
Sanchez, J.

WE CONCUR:


_____
Humes, P.J.


_____
Margulies, J.


*A153523  Moore v. Teed*

26

Trial Court:         San Francisco County Superior Court

Trial Judges:       Hon. Richard B. Ulmer, Jr.


Counsel:

     California Appellate Law Group, Ben Feuer, Charles Kagay, Sarah K. Hofstadter, for Defendant and Appellant

     Farella, Braun + Marter, Sandra A. Edwards; Greines, Martin, Stein & Richland, Laurie J. Hepler, for Plaintiff and Respondent

*A153523  Moore v. Teed*